**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

DONALD R. PEVIA,            *

Plaintiff                   *

v.                       *        Civil Action No. ELH-19-0327

LARRY HOGAN, *et al.*,       *

Defendants            *
                         ***

## MEMORANDUM OPINION

Self-represented plaintiff Donald R. Pevia, an inmate confined at North Branch Correctional Institution ("NBCI"), filed a civil rights complaint pursuant to 42 U.S.C. § 1983 against multiple defendants" Maryland Governor Larry Hogan; Warden Frank Bishop; Stephen T. Moyer as Secretary of the Maryland Department of Public Safety and Correction Services; Commissioner of Corrections Wayne Hill[1]; Assistant Warden Jeffery Nines; Richard Roderick; Vaughn[2] Whiteman; April Carr; and Amy Conner. He alleges that defendants violated his rights under the Religious Land Use and Institutional Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc *et seq.*, and the First and Fourteenth Amendments to the Constitution, because he has been unable to attend a Native American Faith Group ("NAFG") sweat lodge while housed at NBCI. ECF 1. He also complains, *inter alia*, that the limitations on his recreation and programming are unconstitutional. *Id.*

---

[1] The Clerk shall amend the docket to reflect the correct names of Secretary Stephen T. Moyer and Commissioner of Correction Wayne Hill.

[2] The defendants' submissions (ECF 10; ECF 10-1) sometimes use the spelling of "Vaugh." But *see* ECF 8.

Plaintiff seeks declaratory and injunctive relief as well as compensatory and punitive damages regarding his claims that he has been denied access to a sweat lodge and educational programming, and that the general conditions of his housing on Housing Unit (HU) 2 at NBCI violate his due process rights. ECF 1 at 10-11.[3] Plaintiff also appended multiple exhibits to his suit, docketed collectively as ECF 1-1.

Defendants have moved to dismiss or, in the alternative, for summary judgment. ECF 10. The motion is supported by a memorandum (ECF 10-1) (collectively, the "Motion") and multiple exhibits. Plaintiff opposes the motion. ECF 14; ECF 15. He has also submitted 81 pages of exhibits, docketed collectively as ECF 14-1.

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6 (D. Md. 2018). For the reasons that follow, I shall construe the Motion as one for summary judgment, and I shall grant it in part and deny it in part.

## I. Background

A.      Sweat Lodge

Plaintiff is a NAFG member. This is not plaintiff's first civil rights suit concerning his ability to practice his faith. In 2014, Pevia, then an inmate at NBCI, filed suit in this Court, complaining that he was denied the opportunity to participate in Native American Ceremonial Worship. *See Pevia v. Shearin*, ELH-14-0631, ECF 1. In that case, in a Memorandum (ECF 18) and Order (ECF 19) of February 24, 2015, I denied the defendants' dispositive motion. Joseph Damato was subsequently appointed to represent Pevia. *See id.*, ECF 28. Thereafter, the case settled. *Id.*, ECF 42.[4]

---

[3] Page citations correspond to the pagination as reflected on the court's electronic docket.

[4] Mr. Pevia is a frequent litigator in this Court, concerning various aspects of his confinement. I have handled approximately 25 of his cases. *See*, *e.g.*, ELH-18-3902; ELH-18-

2

In this case, plaintiff complains because NBCI has no sweat lodge. He asserts that the NAFG sweat lodge ceremony is "mandated" and "required" by his faith. ECF 1 at 5. Pevia explains that the sweat lodge is used for prayer and cleansing and that participation in "a regular pipe ceremony within the hoop is not the same as conducting a sweat lodge ceremony." ECF 14-1 at 37.

At all relevant times, Pevia has been classified as a maximum-security inmate. *Id.* at 67 (release of information form dated 2/1/19, stating that plaintiff has been designated as maximum security from October 2016 to present). In late 2017, Pevia was housed at Western Correctional Institution ("WCI"), which offers a sweat lodge. ECF 1 at 5; ECF 14-1 at 77 (Facility Security Level Designations from 1/2015). And, on December 21, 2017, while plaintiff was incarcerated at WCI, Pevia participated in a sweat lodge ceremony. ECF 1 at 5.

Pevia was transferred to NBCI on January 21, 2018. ECF 1 at 5. As noted, there is no Native American sweat lodge at NBCI. ECF 10-3 (Amy Conner Decl.) at 1, ¶ 4; ECF 10-5 (Kevin Lamp Decl.), ¶ 2; ECF 10-7 (Richard White Decl.), ¶ 3.

According to plaintiff, in 2015 the Maryland Department of Public Safety and Correctional Services ("DPSCS") approved the use of sweat lodges for NAFG prayer. ECF 1 at 5. DPSCS defines a "sweat lodge" as "a Native American ritual that utilize[es] hot coals within an inipi (a dome-shaped, wood constructed enclosure)." ECF 10-2 at 19 (Religious Services Manual), ¶ 34. Additionally, the Religious Services Manual provides: "Sweat Lodge ceremony shall be available to the general population whose Religious Preference is Native American, providing resources and adequate circumstances permit, and only as a form of congregate worship." *Id*. at 20, ¶ G(2).

---

3900; ELH-18-2395; ELH-18-2176; ELH-17-2796; ELH-16-3810; and ELH-16-1223. The Court may take judicial notice of matters of public record, under Rule 201 of the Federal Rules of Evidence. *See, e.g.*, *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015).

Notably, "Sweat Lodge ceremonies are generally open to offenders in general housing, [but] they are not open to offenders on special confinement housing units. Security staff may restrict the access of offenders in general housing or treatment units if there is a compelling security reason to do so." ECF 10-2 at 20, ¶ G(7). The Faith Group Accommodations Overview, which appears to be an appendix to the Religious Services Manual, provides that the sweat lodge is "[a]vailable to general population, **with exception of maximum security**, disciplinary & administrative segregation, special housing units and protective custody inmates." *Id.* at 24 (emphasis added); ECF 10-7 (Richard Roderick Decl.) at 1, ¶ 2. The frequency of participation may vary or be limited by the capacity of the facility. ECF 10-2 at 20, ¶ G(11). Institutions, conditions permitting, are to make available a minimum of three sweat lodge ceremonies a year. ECF 10-2 at 23 (Faith Group Accommodations Overview.)

Proposals for additional sweat lodge ceremonies are to be submitted to the prison Chaplain, but such a request is to be accommodated only "if resources and adequate circumstances permit and the offender [is] not a threat to safety or security." ECF 10-2 at 20, ¶ G(6). The sweat lodge ceremonies and other religious services may be "[s]uspended, cancelled, postponed or limit[ed] [due to] concerns for facility safety and security [and] inappropriate conduct." *Id.* at 22.

According to plaintiff, NBCI was in the process of building a sweat lodge. ECF 1 at 5. After several months, however, when no sweat lodge was made available, Pevia filed a grievance. *Id.* He did not request to go to WCI or to be transferred to WCI in order to attend the sweat lodge at that facility. ECF 14-1 at 36. And, Chaplain Kevin Lamp, who is assigned to NBCI, avers that inmates housed at NBCI are not permitted to attend the Native American sweat lodge services held at WCI. ECF 10-5, ¶ 2.

Chaplain Lamp also states that he has not received any correspondence from plaintiff

regarding a sweat lodge. ECF 10-5, ¶ 3. But, plaintiff claims that he, along with several other inmates, signed a petition regarding construction of a sweat lodge at NBCI, which presented to Chaplain Lamp. ECF 14-1 at 43, 81. Chaplain Lamp also avers that NBCI does not have the space required for a sweat lodge. ECF 10-5, ¶ 2.

Plaintiff counters that there is sufficient space at NBCI to construct a sweat lodge around the existing Native American fire pit. He has submitted a drawing of the area where he believes the sweat lodge could be constructed. ECF 14-1 at 41, 79. Additionally, Pevia has provided evidence that members of the Iron House Counsel, a volunteer organization that facilitates NAFG services at NBCI, as well as NBCI Hoop members, offered to fund the construction of the sweat lodge. ECF 14-1 at 41, 81; ECF 15.

Defendants also claim that plaintiff's security level, Max I, makes him ineligible to participate in a sweat lodge. ECF 10-4 (April Carr Decl.) at 1, ¶ 3. Further, they assert: "Plaintiff's inability to participate in the Native American Sweat lodge ceremony is because he is housed at NBCI, a maximum security institution." ECF 10-7 (John White Decl.) at 1, ¶ 3. Nevertheless, defendants maintain that, under DPSCS regulations, NAFG inmates at NBCI may practice NAFG through individual prayer, group worship services, possession of faith items, including reading and recorded material, a medicine bag, arm and leg bands, a ribbon shirt, a dream catcher, feathers, and a variety of jewelry. ECF 10-2 at 23-24. Further, inmates housed at Housing Unit 2 may attend religious services using space available as dictated by the administration. *Id*. at 26.

Pevia agrees that maximum security inmates at NBCI are not permitted access to any sweat lodge. But, he argues that there is no additional security threat and the ban on maximum-security inmates' participation serves no penological interest. ECF 1 at 5.

Plaintiff submitted a print-out regarding religious practices, which appears to be from the

Federal Bureau of Prisons. It states that sweat lodge ceremonies are required weekly observances (ECF 14-1 at 45) for NAFG and "[e]qual to the Sacred Pipe as a cornerstone of Native American traditions. . . ." *Id*. at 56.

On August 22, 2018, plaintiff filed Administrative Remedy Procedure ("ARP") NBCI-0986-18, alleging that he was denied the opportunity to participate in a sweat lodge ceremony. ECF 1-1 at 2. The ARP was dismissed with a notation that the "sweat lodge ceremony is 'available to general population with the exception of maximum security, disciplinary and administrative segregation, special housing units, and protective custody inmates.' You are not permitted access to a sweat lodge ceremony." *Id*. Plaintiff unsuccessfully pursued his remedies to the Inmate Grievance Office ("IGO"). *Id*. at 3-7.

Correctional Officer Amy Conner and Sergeant April Carr each aver that they have not communicated with plaintiff about a sweat lodge. ECF 10-3 at 1, ¶ 5; ECF 10-4 at 1, ¶ 2. Conner never observed or heard any other defendant communicate with plaintiff about the sweat lodge. ECF 10-3 at 1, ¶ 5. Carr never communicated with plaintiff about his desire to participate in a sweat lodge or his inability to do so due to his security status. ECF 10-4 1, ¶ 2. Nor did Case Management Manager Richard Roderick communicate with plaintiff regarding any religious activity at NBCI, such as a sweat lodge. ECF 10-7 at 1, ¶ 4. Moreover, Roderick avers that he has no involvement regarding the alleged denial of a religious activity. *Id.*

B.      HU 2

NBCI is organized by "Unit Management." ECF 14-1 at 12. The institution is divided into units, which operate "as if they [are] small institutions within the larger whole." *Id.* There are four units. Housing units 1 and 2 are defined as special management units, which provide a closer level of monitoring due to security reasons. *Id.*

HU 2's Mission Statement (ECF 10-2 at 2) explains that the unit provides a "structured re-entry environment which rewards good behavior with increased privileges." *Id.* Notably, "[d]ue to space and time limits HU2 may not provide the same recreation and programming opportunities as HU 3 & 4. However, HU2 safely provides more recreation and programming than the required minimum" *Id.* Moreover, "[a]ll General Population inmates have the opportunity to work their way to HU3, where more recreation and programming opportunities are available, through time and continued good behavior." *Id.*

Inmates who are placed on HU 2 after serving a term of disciplinary segregation must remain adjustment free for six months before they are able to transfer to HU 3. Those inmates who transfer into NBCI are assigned to HU 2 for one year before they are able to transfer to HU 3. ECF 10-3 (Conner Decl.) at 1-2, ¶ 6; ECF 10-4 (Carr Decl.) at 1, ¶ 4.

Plaintiff alleges that in 2016, a policy was implemented at NBCI that allowed only inmates housed in HU 3 and 4 to participate in programs and recreation. ECF 1 at 8. He explains that in order for an inmate to be moved to HU 3, the inmate must be housed in HU 2 for a specific period of time and then he may move to HU 3 only with the approval of the unit manager. *Id.* at 8. Plaintiff claims that he will always be housed in HU 2, and he is severely restricted to his cell. *Id.* He claims that the implementation of this "level system" violates his rights under the Fourteenth Amendment to due process and "equal opportunity." *Id.*[5] Additionally, he states that the level system was abolished by defendants in 2014 and serves no penological interest. *Id.*

---

[5] In his opposition, plaintiff provides a memo from Warden Bishop to Assistant Commissioner Watson, dated March 10, 2014, referencing ARP NBCI 4133-13, filed by inmate Laron Griffin, which was found meritorious in part. ECF 14-1 at 3. The memorandum to the Assistant Commissioner states that "the Warden has since removed all level related materials from NBCI and implemented an approved Max 1 and 2 security status system (110-12) for future operations at NBCI." *Id.*

Pevia has committed a number of rule violations. These delayed his progression from HU 2 to HU 3. ECF 10-3 at 2, ¶¶ 6-8. Nevertheless, on May 4, 2019, Pevia was transferred to HU 3. ECF 10-2 at 6 (traffic history). At that time, he became eligible for more programming at NBCI. ECF 10-3, ¶ 3; ECF 10-4, ¶ 3. Nevertheless, he remains at a security level of Max I. ECF 10-4, ¶ 3. According to Sergeant Carr, that security level renders him "ineligible to participate in the Sweat Lodge." *Id.*

C.      GED

In the Complaint, plaintiff summarily asserts that denial of access to the "GED program violates [his] rights . . . ." ECF 1 at 10. This is essentially the only reference in the Complaint concerning a program to obtain a GED (*i.e.*, General Educational Diploma).

Plaintiff filed an administrative remedy procedure on August 28, 2018 (ARP NBCI-1415-18), complaining about the denial of school and other unidentified programs due to his being housed in HU 2. ECF 1 at 7; ECF 1-1 at 1, 8-12. He pursued his remedies through the IGO, to no avail. ECF 1 at 7, 13.

Notably, because plaintiff has been transferred to Housing Unit 3, he is now eligible for educational programs, including the GED program. ECF 10-4, ¶ 3.

**II. Standard of Review**

Defendants' motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Adams Housing, LLC v. The City of Salisbury, Maryland*, 672 Fed App'x. 220 (4th Cir. 2016) (per curiam). However, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[6]

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5 C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural

---

[6] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Adams Housing, LLC*, *supra*, slip op. at 7 ("The court must give notice to ensure that the party is aware that it must 'come forward with all of [its] evidence.'") (citation omitted).

rights." *Id*. at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id*. at 165, 167.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours and Co. v. Kolon Industries*, *Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2012); *see Putney v. Likin*, 656 Fed. App'x 632, 638 (4th Cir. 2016) (per curiam); *McCray v. Maryland Dep't of Transportation*, 741 F.3d 480, 483 (4th Cir. 2015). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).

To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)). "[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F.Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted), reversed on other grounds sub nom., *Gardner v. Ally Financial, Inc.*, 514 Fed. App'x 378 (4th Cir. 2013) (per curiam). A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat

summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874-75 (4th Cir. 2019); *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods*, 302 F.3d at 244 (citations omitted). But, the nonmoving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature. Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id*. (internal citations omitted).

According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Harrods*, 302 F.3d at 244-45 (internal citations omitted); *see also Putney*, 656 Fed. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). Moreover, "[t]his is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 656 Fed. App'x at 638.

Plaintiff has not sought discovery. Moreover, both sides have submitted numerous exhibits. The claims concerning the sweat lodge would easily survive a motion to dismiss. I am

satisfied that it is appropriate to address defendants' Motion as one for summary judgment. By construing the Motion as one for summary judgment, it will facilitate the progress of this case, to include highlighting evidentiary deficiencies in the record that preclude resolution of the case in its entirety.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law.").

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing

that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 645 (4th Cir. 2002); *see Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Moreover, the trial court may not make credibility determinations on summary judgment. *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.

Nevertheless, to defeat summary judgment, conflicting evidence, if any, must give rise to a *genuine* dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id*. at 248; *see Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "the mere

existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

## III. Discussion

### A. Section 1983 Generally

Pursuant to 42 U.S.C. § 1983, a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Graves v. Loi*, 930 F.3d 307, 318-19 (4th Cir. 2019); *Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 575 U.S. 983 (2015). However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017). In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).

"The first step in any such claim is to pinpoint the specific right that has been infringed." *Safar*, 859 F.3d at 245. To state a claim under § 1983, a plaintiff must allege (1) that a right secured

by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019); *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997).

The phrase "under color of state law" is an element that "'is synonymous with the more familiar state-action requirement' for Fourteenth Amendment claims, 'and the analysis for each is identical.'" *Davison*, 912 F.3d at 679 (quoting *Philips v. Pitt County Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982). A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Polk Cty. v. Dodson*, 454 U.S. 312, 317-18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)); *see also Philips*, 572 F.3d at 181 ("[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient.") (citations and internal quotation marks omitted).

To pursue a § 1983 claim against defendants in their individual capacities, plaintiff must show that defendants "acted personally in the deprivation of the plaintiffs' rights." *Vinnedge v. Gibbs*, 550 F. 2d 926, 928 (4th Cir. 1977). It is insufficient to show that subordinates of a sued official deprived plaintiff of his rights, as the doctrine of respondeat superior does not apply to § 1983 cases. *See Love-Lane v. Martin*, 355 F. 3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under §1983). If plaintiff has not alleged any personal connection between a defendant

and a denial of constitutional rights, the claim against that defendant must fail. *Vinnedge*, 550 F. 2d at 928.

Liability under § 1983 attaches only upon personal participation by a defendant in the constitutional violation. *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001); *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). As noted, liability is imposed on "any person who shall subject, or cause to be subjected, any person . . . to the deprivation of any rights. . . ." 42 U.S.C. § 1983.

It appears uncontroverted that Governor Hogan, Case Management Manager Richard Roderick, Lt. Vaughn Whiteman, Sgt. April Carr, and Officer Amy Conner have no personal involvement in the development of any policy concerning a sweat lodge at NBCI. *See Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658 (1978). Nor did any of them prevent plaintiff from accessing a sweat lodge. Therefore, they are entitled to summary judgment.

Based on the record, and as discussed, *infra*, the Court lacks an adequate evidentiary basis to resolve plaintiff's policy claims against Warden Bishop, Secretary Moyer, Commissioner Hill, and Assistant Warden Nines.

### B. Eleventh Amendment Immunity

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or subjects of any Foreign State." *See Hans v. Louisiana*, 134 U.S. 1, 3 (1890); *see also Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) ("The ultimate guarantee of the Eleventh Amendment is that nonconsenting states may not be sued by private individuals in federal court."). Therefore, absent consent or a valid congressional abrogation of sovereign immunity, the Eleventh Amendment bars a private individual from bringing suit against a state in federal court to recover damages, unless

there is an exception to sovereign immunity. *See Coleman v. Court of Appeals of Md.*, 556 U.S. 30, 35 (2012) ("A foundational premise of the federal system is that States, as sovereigns, are immune from suits for damages, save as they elect to waive that defense."); *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247 (2011); *see also Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54-55 (1996) ("For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States was not contemplated by the Constitution when establishing the judicial power of the United States.") (internal quotation marks and citation omitted).

The Eleventh Amendment did not create sovereign immunity, however. Rather, it preserved the sovereign immunity that the states enjoyed prior to the formation of the Union. *See Alden v. Maine*, 527 U.S. 706, 724 (1999); *see also Sossamon v. Texas*, 563 U.S. 277, 284 (2011). State sovereign immunity "accord[s] states the dignity that is consistent with their status as sovereign entities[.]" *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760 (2002).

Notably, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (internal citation omitted). Moreover, state sovereign immunity bars suit against an instrumentality of a state, sometimes referred to as an "arm of the state," including state agencies. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."); *see also Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997); *Pense v. Md. Dep't of Pub. Safety & Corr. Servs.*, 926 F.3d 97, 100 (4th Cir. 2019); *McCray v. Md. Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014); *Bland v. Roberts*, 730

F.3d 368, 389 (4th Cir. 2013); *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 479 (4th Cir. 2005).

The Fourth Circuit has recognized that the defense of sovereign immunity is a jurisdictional bar, stating that "'sovereign immunity deprives federal courts of jurisdiction to hear claims, and a court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject-matter jurisdiction.'" *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018) (quoting *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 207 (5th Cir. 2009)). But, a defendant "bears the burden of demonstrating" sovereign immunity, because it is "akin to an affirmative defense." *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014).

The Fourth Circuit has identified three exceptions to the Eleventh Amendment's prohibition of suits against a state or an arm of the state. In *Lee-Thomas v. Prince George's County Public Schools*, 666 F.3d 244 (4th Cir. 2012), the Court said, *id.* at 249 (internal quotations omitted):

> First, Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority. *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) . . . . Second, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law. *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) . . . . Third, a State remains free to waive its Eleventh Amendment immunity from suit in a federal court. *Lapides v. Bd. of Regents of Univ. Sys. of Ga.,* 535 U.S. 613, 618 (2002).

Sovereign immunity has not been congressionally abrogated for claims under § 1983. In *Quern v. Jordan*, 440 U.S. 332, 345 (1979), the Supreme Court concluded that § 1983 suits by individuals against a state for money damages are barred by the Eleventh Amendment. It said, *id.*: "[Section] 1983 does not explicitly and by clear language indicate on its face an intent to sweep away the immunity of the States[.]"

To be sure, a state may waive its Eleventh Amendment sovereign immunity and permit suit

in federal court.  *See Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 618 (2002); *see Pense*, 926 F.3d at 101; *Lee-Thomas*, 666 F.3d at 249.  But, the test to determine whether a state has waived its immunity from suit in federal court is a "stringent" one.  *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 240 (1985), *superseded on other grounds, as recognized in Lane v. Pena*, 518 U.S. 187, 198 (1996); *see Pense*, 939 F.3d at 101.  Under *Atascadero*, 473 U.S. at 254, a court may find that a state has waived its Eleventh Amendment immunity "only where stated by the most express language or by such overwhelming implication from the text as will leave no room for any other reasonable construction."  (Internal quotation marks and alteration omitted); *accord Pense*, 926 F.3d at 101; *Lee-Thomas*, 666 F.3d at 250-51.

State sovereign immunity "is an immunity from private suit; it does not . . . bar federal enforcement actions."  *Passaro v. Virgina*, 935 F.3d 243, 248 (4th Cir. 2019) (citing *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 71 n.14 (1996)).  And, under *Ex parte Young*, 209 U.S. 123 (1908), sovereign immunity does not extend to a request for prospective injunctive relief to correct an ongoing violation of law.  However, to avoid an Eleventh Amendment bar to suit on this basis, the complaint must be lodged against a state official, and it must "alleg[e] an ongoing violation of federal law and see[k] relief properly characterized as prospective."  *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002).

Plaintiff's claim for damages asserted under 42 U.S.C. § 1983 may not proceed against defendants in their official capacity.  Congress did not abrogate the states' sovereign immunity when it enacted 42 U.S.C. § 1983.  *Will*, 491 U.S. at 66.  Although the State of Maryland has waived its sovereign immunity for certain types of cases brought in state courts, *see* Md. Code, State Gov't § 12-202(a), it has not waived its immunity under the Eleventh Amendment to suit in federal court.  "A State's constitutional interest in immunity encompasses not merely whether it

may be sued, but where it may be sued." *Halderman*, 465 U.S. at 100 (emphasis in original).

Moreover, plaintiff's claim for damages under RLUIPA are also barred. RLUIPA does not permit a private cause of action against state prison employees for conduct taken in their official or individual capacities, as the statute does not waive a state's sovereign immunity under the Eleventh Amendment. *Sossaman v. Texas*, 563 U.S. at 293 (concluding that acceptance of federal funds by states does not amount to consent to waiver of sovereign immunity to RLUIPA claims for monetary damages against state employees in their official capacities); *Rendelman v. Rouse*, 569 F.3d 182, 189 (4th Cir. 2009) (concluding that RLUIPA does not authorize a claim for money damages against a state employee sued in his individual capacity).

In contrast, plaintiff's request for injunctive relief is not barred by the Eleventh Amendment. This is because the Eleventh Amendment does not bar suits seeking prospective injunctive relief, as long as such relief would not impose monetary liability. *Edelman v. Jordan*, 415 U.S. 651, 664 (1974).

### C. HU 2

Defendants contend that plaintiff's complaint regarding the conditions of confinement in HU 2 is moot because he has been transferred to HU 3. ECF 10-1 at 5. Article III of the Constitution limits judicial power to "actual, ongoing cases or controversies." *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990) (citations omitted). "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III – when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc*., 568 U.S. 85, 91 (2013) (internal quotation marks omitted).

Where injunctive relief is requested, it is possible for events occurring subsequent to the filing of the request to render the matter moot. *See Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir.

1991) (transfer of prisoner moots his Eighth Amendment claims for injunctive and declaratory relief); *see also Slade v. Hampton Rd's Reg'l Jail*, 407 F.3d 243, 248–49 (4th Cir. 2005) (pretrial detainee's release moots his claim for injunctive relief); *Magee v. Waters*, 810 F.2d 451, 452 (4th Cir. 1987) (concluding that the transfer of a prisoner rendered moot his claim for injunctive relief).

It is true that plaintiff's transfer to HU 3 moots his claim for injunctive relief regarding his placement on HU 2. But, plaintiff also seeks damages. Nevertheless, his claim that he has been deprived of due process based on his prior assignment to HU 2 is unavailing.

The Fourteenth Amendment's Due Process Clause guarantees that no state shall "deprive any person of ... liberty ... without due process of law." To bring a due process claim, a plaintiff must first show the existence of a protected property or liberty interest. *Mathews v Eldridge*, 424 U.S. 319, 332 (1976); *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). A plaintiff may bring a civil action to redress due process violations under 42 U.S.C. § 1983.

In the prison context there are two different types of constitutionally protected liberty interests that may be created by government action. The first is created when there is a state created entitlement to an early release from incarceration. *Board of Pardons v. Allen*, 482 U.S. 369, 381 (1987) (state created liberty interest in parole); *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974) (state created liberty interest in good conduct credits). The second type of liberty interest is created by the imposition of an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *see Wilkinson v. Austin*, 545 U.S. 209 (2005). As the Fourth Circuit has noted, "[t]he Supreme Court has long recognized that a prisoner may have a state-created liberty interest in certain prison confinement conditions…." *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015). Whether confinement conditions are atypical and substantially harsh "in relation to the ordinary incidents of prison life"

is a "necessarily . . . fact specific" comparative exercise. *Beverati v. Smith*, 120 F.3d 500, 502-3 (4th Cir. 1997); *accord Ramirez v. Galaza*, 334 F.3d 850, 861 (9th Cir. 2003) ("There is no single standard for determining whether a prison hardship is atypical and significant, and the condition or combination of conditions or factors . . . requires case by case, fact by fact consideration.") (alteration in original) (internal quotation marks omitted).

The case of *Wilkinson*, 545 U.S. 209, involved transfer to and housing in the isolated confinement of a "supermax" facility. *Id*. at 213. It also involved solitary confinement-- isolated human contact for potentially "indefinite" periods. *Id*. at 224. The Court recognized that the severe deprivations detailed in that case exist in most solitary confinement facilities, and looked at the presence of added factors to find "an atypical and significant hardship" on inmates such that they had a liberty interest in avoiding it. *Id*. at 224. These factors were (1) the potentially indefinite length of detention, limited only by the length of the underlying sentence, and (2) being rendered ineligible for parole due to confinement. *Id*. The Supreme Court said: "While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context." *Id*. Therefore, such prisoners have a protected liberty interest in avoiding placement in such confinement. *Id*.

The Fourth Circuit has explained: "*Wilkinson* does not hold that harsh or atypical prison conditions in and of themselves provide the basis of a liberty interest giving rise to Due Process protection." *Prieto*, 780 F.3d at 250. Rather, there must exist an interest in avoiding "erroneous placement [in the challenged confinement] under the state's classification regulations combined with . . . harsh and atypical conditions" for Due Process protections to apply. *Id*. (emphasis in original) (citing *Wilkinson*, 545 U.S. at 224-25).

"[T]he general population is the baseline for atypicality for inmates who are sentenced to confinement in the general prison population and have been transferred to security detention while serving their sentence." *Incumaa v. Stirling*, 791 F.3d 517, 527 (4th Cir. 2015). Where conditions in segregated confinement are "similar in most respects to those experienced by inmates in the general population," no liberty interest exists in avoiding that segregation assignment. *Bevarati*, 120 F.3d at 503. But, for an inmate sentenced to death and on death row, as in *Prieto*, 780 F.3d 245, "using the general population to gauge the ordinary incidents of prison life . . . was improper." *Incumaa*, 791 F.3d at 528 (citing *Prieto*, 780 F.3d at 252-54). Although the nature of a prisoner's conviction and the length of his sentence do not give rise to differing liberty interests, "'state law mandates [regarding] the confinement conditions to be imposed on offenders convicted of a certain crime and receiving a certain sentence . . . are, by definition, the ordinary incidents of prison life for such offenders.'" *Id.* (quoting *Prieto*, 780 F.3d at 254) (alterations in *Incumaa*).

As a prisoner, plaintiff is not entitled to the process due to persons who remain at liberty. "Prisoners held in lawful confinement have their liberty curtailed by definition, so the procedural protections to which they are entitled are more limited than in cases where the right at stake is the right to be free from confinement at all." *Wilkinson*, 545 U.S. at 225.

Plaintiff has not sufficiently identified which conditions of his confinement on HU 2 were different from those assigned to other housing units. Based on the limited information provided by plaintiff, he did not experience conditions that were atypical. Therefore, he cannot sustain a claim for a due process violation.

Moreover, there is no constitutional right for an inmate prisoner to be housed in a particular institution, at a particular custody level, or in a particular portion or unit of a correctional institution. Nor does a prisoner have a right to participate in a particular program. *See Sandin*,

515 U.S. at 484 (concluding that protected liberty interests are generally limited to freedom from restraint, which imposes atypical and significant hardship on inmate in relation to ordinary incidents of prison life); *McKune v. Lile*, 536 U.S. 24, 26 (2002) (stating that the "decision where to house inmates is at the core of prison administrators' expertise"); *Meachum v. Fano*, 427 U.S. 215, 225 (1976) (holding that the Constitution's Due Process Clause does not "protect a duly convicted prisoner against transfer from one institution to another within the state prison system"); *see also Olim v. Wakinekona*, 461 U.S. 238, 244-45 (1983); *Rizzo v. Dawson*, 778 F. 2d 527, 530 (9th Cir. 1985).

Matters of security classification are reserved to the sole discretion of prison officials. *See Slezak v. Evatt*, 21 F.3d 590, 594 (4th Cir. 1994). In analyzing conditions of confinement, the court must consider a correctional system's need to maintain order, discipline, and control. *See Sandin*, 515 U.S. at 483-84 (stating that "federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment"); *see also Wolff*, 418 U.S. at 558–62.

In sum, this court is unaware of any Maryland law or regulation conferring a protected liberty interest on DOC inmates that has been abridged here. Absent a protected liberty interest, a plaintiff cannot successfully claim that his due process rights were violated, because "[p]rocess is not an end in itself." *Olim*, 461 U.S. at 250. Reviewing plaintiff's allegations in the light most favorable to him, there are no genuine issues of disputed material fact and defendants are entitled to summary judgment in their favor as a matter of law.

Also relevant to Pevia's claim regarding conditions on HU 2, the Court takes notice of the fact that in 2014 he filed a complaint alleging that the levels program implemented in 2013 at NBCI violated his rights because his access to showers, recreation, out of cell activities, and

programming were severely restricted. That "levels" program was never fully adopted at NBCI. Ultimately, in *Pevia v. Shearin*, ELH-14-2928, I found that plaintiff's rights had not been violated by the conditions experienced by him, and I granted defendants' motion for summary judgment. *Id.*, ECF 22.

Plaintiff has also filed several other suits, challenging other aspects of the privileges extended to HU 2 inmates. Each of his complaints has been unsuccessful. *See*, *e.g.*, *Pevia v. Nines*, Civil Action ELH-17-10, ECF 33 (unable to order paintbrushes due to security classification and assignment to HU 2); *Pevia v. Commissioner of Correction, et al*, Civil Action ELH-17-273, ECF 31 (denial of access to legal materials due to being housed in HU 2); *Pevia v. Bishop*, Civil Action ELH-17-2796, ECF 24 (denial of access to religious programming due to being housed in HU 2); *Pevia v. Corcoran, et al.*, Civil Action ELH-18-2395, ECF 17 (denial of access to educational programming due to being housed in HU 2).

As to the claim here concerning denial of access to GED programming, plaintiff raised the exact same claim in *Pevia v. Corcoran, et al.*, Civil Action No. ELH-18-2395. In that case, he sued defendants Deyana Corcoran, Frank Bishop, Vaughn Whiteman, Amy Conner, and Governor Larry Hogan.

The doctrine of *res judicata* precludes the assertion of a claim after a judgment on the merits in a prior suit by parties on the same cause of action. *See Meekins v. United Transp. Union*, 946 F. 2d 1054, 1057 (4th Cir. 1991). In addition, "'[n]ot only does *res judicata* bar claims that were raised and fully litigated, it prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding.'" *Id*. (quoting *Peugeot Motors of America, Inc. v. Eastern Auto Distributors, Inc.*, 892 F. 2d 355, 359 (4th Cir. 1989)).

**D. Sweat Lodge**

At the heart of this case is plaintiff's claim that defendants have deprived him of his rights under RLUIPA and the First Amendment, by denying him access to a sweat lodge. I turn to that contention.

"Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *O'lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). However, with respect to the free exercise of religion, prison inmates retain a right to reasonable opportunities for free exercise of religious beliefs, without concern for the possibility of punishment. *See Turner v. Safley*, 482 U.S. 78, 89 (1987); *Cruz v. Beto*, 405 U.S. 319, 322 (1972). That right is not unfettered, however. Prison restrictions that impact on the free exercise of religion but are related to legitimate penological objectives do not run afoul of the Constitution. *See Turner*, 482 U.S. at 89-91.

As a threshold matter, to state a claim for violation of rights under the Free Exercise Clause of the First Amendment, a, plaintiff must demonstrate that: (1) he holds a sincere religious belief; and (2) a prison practice or policy places a substantial burden on his ability to practice his religion. *See Wilcox v. Brosn*, 877 F. 3d 161, 168 (4th Cir. 2017) (citing *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981)). A substantial burden is placed upon a prisoner's religious exercise when it "puts substantial pressure on an adherent to modify his behavior and to violate his beliefs or . . . forces a person to choose between following the precepts of her religion and forfeiting governmental benefits, on the one hand, and abandoning the precepts of her religion on the other hand." *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006) (cleaned up).

Religious observances need not be uniform to merit First Amendment protection. *See*

*Morrison v. Garraghty*, 239 F. 3d 648, 659 (4th Cir. 2001; *see also Dettmer v. Landon*, 799 F. 2d 929, 932 (4th Cir. 1986) (prison officials may not deny religious articles to Wiccans based on officials' definition of what constitutes a religion). "Courts are not arbiters of scriptural interpretation." *Thomas v. Review Bd*, 450 U.S. 707, 714 (1981). Moreover, "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Id*. at 714. Nonetheless, where there is a legitimate security concern at issue, such as insuring compliance with rules of behavior during worship services, temporary suspension of attendance at congregate worship does not violate the First Amendment. *See Turner*, 482 U.S. at 89-91 (1987) (restrictions that impact on the free exercise of religion but are related to legitimate penological objectives do not run afoul of the Constitution).

The test to determine if restrictions are justified requires examination of whether there is a rational relation between the asserted governmental interest and the regulation in question. In addition, the court must examine whether there are alternative means of exercising the right asserted and whether readily available alternatives to the regulation would be less restrictive; and whether accommodation of the right will impact the orderly operations of the prison. *Turner*, 482 U.S. at 89-91.

Plaintiff's religious practices are also protected under RLUIPA. In relevant part, RLUIPA states:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ..., even if the burden results from a rule of general applicability, unless the government demonstrates that the imposition of the burden on that person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. §2000cc-1(a).

On July 27, 2000, RLUIPA passed both the House of Representatives and the Senate by unanimous consent, and it was signed into law by President Clinton on September 22, 2000, as P.L. 106-274. *Taylor v. Cockrell*, No. CIV.A. H-00-2809, 2002 WL 34423557, at *4 n.3 (S.D. Tex. Sept. 25, 2002). Congress enacted RLUIPA, and "its sister statute, the Religious Freedom Restoration Act of 1993 (RFRA), 107 Stat. 1488, 42 U.S.C. § 2000bb *et seq.*, 'in order to provide very broad protection for religious liberty.'" *Holt v. Hobbs*, 574 U.S. 352, ___, 135 S. Ct. 853, 859 (2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014)). Indeed, "Congress intended [to] do more than merely codify First Amendment jurisprudence." *Bethel World Outreach Ministries v. Montgomery County Council*, 706 F.3d 548, 556 (4th Cir. 2013) ("*Bethel*"); *see also Madison v. Riter*, 355 F. 3d 310, 314-15 (4th Cir. 2003).

RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." *Cutter v. Wilkinson,* 544 U.S. 709, 721 (2005); *see Holt v. Hobbs,* 135 S.Ct. at 859–60; *Smith v. Ozmint,* 578 F.3d 246, 250 (4th Cir. 2009); *Lovelace v. Lee,* 472 F.3d 174, 186 (4th Cir. 2006). Enactment of RLUIPA affords religious free exercise rights to prisoners, similar to those enjoyed by those who are not incarcerated. *See Cutter*, 544 U.S. at 715-17.

RLUIPA defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A); *Holt,* 135 S.Ct. at 860; *Smith.* 578 F.3d at 251. Under RLUIPA, the inmate initially must show that the challenged policy substantially burdens his exercise of his religion. *See* 42 U.S.C. § 2000cc–2(b); *Holt*, 135 S.Ct. at 862. Although RLUIPA does not define "substantial burden", courts have held

that the term has the same meaning as it does in the context of the Free Exercise Clause of the First Amendment. *Lovelace*, 472 F.3d at 187.

"A substantial burden exists where a regulation 'puts substantial pressure on [the plaintiff] to modify [his] behavior'" and to violate his beliefs. *Jesus Christ Is the Answer Ministries, Inc. v. Baltimore County, Maryland*, 915 F.3d 256, 260 (4th Cir. 2019) (quoting *Bethel*, 706 F.3d at 556); *see Thomas v. Review Bd. Of Ind. Employment Sec. Div.*, 450 U.S. 707, 718 (1981). A prison regulation also imposes a substantial burden when it "forces a person to choose between following the precepts of [his] religion and forfeiting governmental benefits, on the one hand, and abandoning one of the precepts of [his] religion . . . on the other hand." *Lovelace*, 472 F.3d at 187.

Although a plaintiff need not prove that the practice at issue is "required or essential" to his religion, he must at least "demonstrate that the government's denial of a particular religious . . . observance was more than an inconvenience to [his] religious practice." *Tillman v. Allen*, 187 F.Supp.3d 664, 673 (E.D. Va. 2016) (citations omitted). Moreover, "'courts properly consider whether the inmate retains other means for engaging in the particular religious activity . . . in assessing whether a denial of the inmate's preferred method for engaging in that religious exercise imposes a substantial burden.'" *Tillman*, 187 F.Supp.3d at 674 (quoting *Shabazz v. Va. Dep't Corr.*, 3:10CV638, 2013 WL 1098102, at *7 (E.D.Va. Mar. 15, 2013)). But, a substantial burden claim "does not require a showing of discriminatory governmental conduct." *Andon, LLC v. City of Newport News, Va.*, 813 F.3d 510, 514 (4th Cir. 2016); *Bethel*, 706 F.3d at 557 (recognizing that substantial burden provision protects against both discriminatory and non-discriminatory conduct that imposes a substantial burden on religion).

Here, defendants contend that plaintiff has failed to meet his burden of demonstrating a substantial burden to his religious practice. I disagree.

There is no dispute that plaintiff is a member of the NAFG. Pevia claims that sweat lodge ceremonies are a cornerstone of Native American traditions. ECF 14-1 at 56. Further, he has provided documents that explain that sweat lodges are required and used for prayer and cleansing, and that participation in the pipe ceremony is not the same as a sweat lodge ceremony. ECF 14-1 at 37. Notably, the sweat lodge has been recognized as "central and fundamental" to Native American faith traditions. *Yellowbear v. Lampert*, 741 F.3d 48, 56 (10th Cir. 2014) (citing *Werner v. McCotter*, 49 F.3d 1476, 1480 (10th Cir. 1995)). And, the parties agree that plaintiff is not permitted to exercise his sincerely held religious belief to participate in a sweat lodge.

A regulation that requires action or inaction, in violation of a sincerely held religious belief, amounts to a "substantial burden" on the exercise of religion. A reasonable factfinder could conclude that defendants have substantially burdened plaintiff's religious exercise by refusing him any access to a sweat lodge, thus flatly prohibiting plaintiff from participating in this important religious practice.

RLUIPA "prescribes a shifting burden of proof for inmate religious exercise claims." *Incumaa v. Stirling*, 791 F.3d 517, 525 (4th Cir. 2015). When, as here, the prisoner "demonstrate[s] that the prison's policy exacts a substantial burden on religious exercise," the burden "shifts to the government to prove its policy furthers a compelling governmental interest by the least restrictive means." *Id*. Given that plaintiff has met his initial burden, the burden shifts to defendants to demonstrate that the burden on plaintiff serves a compelling governmental interest and is the least restrictive means to further that interest.

Prison security is a compelling interest. *Cutter*, 544 U.S. at 725, n. 13. Courts "are ill equipped to deal with the increasingly urgent problems of prison administration and reform" and must exercise restraint in cases dealing with the administration of prisons. *Procunier v. Martinez*,

416 U.S. 396, 405 (1974). Therefore, deference is given to prison administrators who must regulate the prison while balancing the prisoners' rights to free exercise of religion with the maintenance of the security of the institution. *Cutter*, 544 U.S. at 723. Moreover, in enacting RLUIPA, Congress "anticipated that courts would apply [RLUIPA's] standard with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline consistent with considerations of costs and limited resources." *Cutter* 544 U.S. at 723 (citing legislative history).

However, "RLUIPA's compelling interest test is a strict one: Congress borrowed its language from First Amendment cases applying perhaps the strictest form of judicial scrutiny known to American law. That test isn't traditionally the sort of thing that can be satisfied by the government's bare say-so." *Yellowbear*, 741 F.3d at 59 (citing *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 500–01 (1989)).

Defendants offer both conclusory and contradictory assertions regarding their inability to provide a sweat lodge at NBCI. Their explanations neither satisfy RLUIPA's standards nor demonstrate that the denial of a sweat lodge is related to a legitimate penological objective under the standard in *Turner v. Safely*, 482 U.S. 78.

Chaplain Lamp claims that NBCI is without sufficient space to provide a sweat lodge, but he does not explain what space is required. Defendants also claim in their Motion that NBCI is without sufficient resources to provide a sweat lodge (ECF 10-1 at 3), but they do not identify what those resources would be. Defendants do not even attempt to quantify the costs faced in constructing and supervising a sweat lodge, nor explain how such costs would impinge on prison budgets or administration. Instead, defendants simply assert that NBCI is without sufficient space or other unidentified resources.

On the other hand, plaintiff has provided evidence that a volunteer organization and Native American inmates are willing to pay for the construction of the sweat lodge. He also provided schematics of the space requirements and explains how the sweat lodge could be constructed in the outdoor space already set aside for Native American worship, plausibly demonstrating that there is sufficient space at NBCI to construct a sweat lodge. Defendants failed to respond to either of plaintiff's assertions. Accordingly, on this record it is impossible to determine what "resources" or space NBCI lacks in regard to construction of a sweat lodge.

Additionally, Case Manager Roderick avers that the reason a sweat lodge is not available is simply because plaintiff cannot participate in a sweat lodge because he is a maximum-security inmate. But this too cannot be the reason why no sweat lodge has been built at NBCI, given that a sweat lodge is available at WCI, a maximum-security facility adjacent to NBCI, and the facility where plaintiff previously participated in a sweat lodge ceremony while classified as a maximum-security inmate.

Rather than rely on the averments of Lamp or Roderick, in their Motion defendants argue that "[p]laintiff's behavior makes maintaining security at NBCI an especially compelling interest for enforcing DPSCS regulations on sweat lodges. Plaintiff has been placed on administrative segregation at least eleven times following his conviction in 2002." ECF 10-1 at 11; ECF 10-2 at 6-14. Therefore, defendants reason: "Preventing plaintiff from attending any potential sweat lodge services at NBCI was and remains a compelling government interest." ECF 10-1 at 11. Defendants also contend that transporting plaintiff to sweat lodge services at WCI or another institution where sweat lodge services are available would burden DPSCS with the costs of transportation. ECF 10-1 at 11.

Pevia's adjustment record might make him ineligible to participate in congregate prayer.

But, there is insufficient explanation on this record as to how or why, or even whether, such a consideration was made in plaintiff's case. Similarly, regarding the claim that plaintiff cannot be transported to WCI, defendants' assertion is unsupported by record evidence.

Indeed, these conclusory contentions appear to be little more than after-the-fact rationalizations, which are entirely unsupported by the record evidence. For example, the response to plaintiff's ARP did not indicate that he was unable to participate in a sweat lodge because he had a poor adjustment record. Moreover, plaintiff was permitted to attend a sweat lodge service at WCI on December 21, 2017. At that time, he had received at least two rule infractions that calendar year, the latest on February 7, 2017. ECF 10-2 at 33. Yet, as of the date of the filing of the Motion, plaintiff had been infraction free for nearly nine months. *Id*.

Although defendants now claim that plaintiff's sweat-lodge request is due to security reasons based on plaintiff's adjustment record and the undefined "burden" of transportation, these claims appear only in defendants' Motion and not in any affidavits from decision makers or in the record of the prison's decision-making process in response to plaintiff's ARP. "[E]xplanations offered for the first time in litigation ought to come with a truth-in-litigating label, requiring the official to disclose whether the new explanations motivated the prison officials at the time of decision or whether they amount to post hoc rationalizations. Only the true explanations for the policy count." *Haight v. Thompson*, 763 F.3d 554, 562 (6th Cir. 2014) (citing *Shaw v. Hunt,* 517 U.S. 899, 908 n. 4 (1996) ("To be a compelling interest, the State must show that the alleged objective was the ... 'actual purpose' for the [government's action].")).

As I see it, there is a genuine dispute of material fact as to whether the various explanations for the denial of a sweat lodge at NBCI represent the true explanations for defendants' decision. The deference this court must extend to prison officials does not reach so far that defendants may

simply announce a compelling government interest. At this stage of the proceedings, defendants must do more than simply declare an "undue burden" or a "compelling interest." *Yellowbear*, 741 F.3d at 59–60 (collecting cases). In short, defendants have failed to meet their burden regarding the denial of plaintiff's requests to be provided a sweat lodge at NBCI.

Defendants might be able to meet their burden. *See*, *e.g.*, *Fowler v. Crawford*, 534 F.3d 931, 942 (8th Cir. 2008) (holding prison officials met their burden that prohibiting a sweat lodge at the facility was the least restrictive means to further the institution's compelling interest in safety and security). But, they have failed to do so here. As such, as to defendants Bishop, Moyer, Hill, and Nines, summary judgment is inappropriate at this stage of the proceeding as to plaintiff's RLUIPA and First Amendment claims.

### E. Qualified Immunity

Defendants contend that they are protected from suit by qualified immunity. Their qualified immunity defense is unavailing at this juncture. Plaintiff's constitutional right was well established at the relevant time, and there exists a material dispute of fact regarding whether the denial of access to a sweat lodge violated plaintiff's rights under the First Amendment or RLUIPA. *See Willingham v. Crooke*, 412 F.3d 553, 559 (4th Cir. 2005).

Qualified immunity is often determined at the summary judgment stage of litigation. *See Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003). But, the defense of "[q]ualified immunity does not . . . override the ordinary rules applicable to summary judgment proceedings." *Willingham*, 412 F.3d at 559 (citing *Pritchett v. Alford*, 973 F.2d 307, 313 (4th Cir. 1992)). The determination of whether defendants are entitled to qualified immunity on these claims is more appropriately addressed after the facts of the case have been further developed.

Accordingly, dismissal of the Complaint based on qualified immunity is not proper at this time.

## F. Equal Protection

Plaintiff alleges that his right to Equal Protection under the Fourteenth Amendment was denied by defendants. The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985) (citation omitted). However, differential treatment alone does not state an equal protection claim without a showing that the inmate was similarly situated to those treated differently. *See Moss v. Clark,* 886 F.2d 686, 691 (4th Cir. 1989).

"To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). To survive a motion for summary judgment, plaintiff must provide specific, non-conclusory allegations that demonstrate an improper motivation. *Williams v. Hansen*, 326 F. 3d 569, 584 (4th Cir. 2003). Once plaintiff has made this showing, the court then determines whether the disparate treatment can be justified. *See, e.g. City of Cleburne*, 473 U.S. at 439-40.

Because of the special considerations regarding the administration of penal institutions and the limitation of many privileges and rights of prisoners due to their incarceration, a "prison regulation [that] impinges on inmates' constitutional rights . . . is valid if it is reasonably related to legitimate penological interests." *Morrison* 239 F.3d at 654-55 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987))(other citations omitted). In short, the policies in place must meet a test of reasonableness.

Plaintiff's claim that he was treated differently than other inmates is without support. No inmates at NBCI are provided access to sweat lodge ceremonies. Additionally, plaintiff has failed to put forth any evidence of discriminatory intent. There is no evidence that defendants acted intentionally or purposefully in order to discriminate against him.

## G. Injunctive Relief

A preliminary injunction is an extraordinary and drastic remedy. *See Munaf v. Geren,* 553 U.S. 674, 689–90 (2008). A party seeking a preliminary injunction or temporary restraining order must establish the following elements: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) why the injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). As to irreparable harm, the movant must show the harm to be "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Medical Group,* 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted).

In the prison context, courts should grant preliminary injunctive relief involving the management of correctional institutions only under exceptional and compelling circumstances. *See Taylor v. Freeman*, 34 F.3d 266, 269 (4th Cir. 1994). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at, 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)).

I shall deny the request for injunctive relief, as plaintiff has failed to demonstrate that the requested injunctive relief is necessary to avoid irreparable harm or that he is likely to succeed on the merits. Nor does plaintiff argue how the balance of equity tips in his favor or that an injunction

is in the public interest.  As such, the request for injunctive relief is denied.

## IV. Conclusion

For the reasons set forth above, defendants' Motion is granted in part and denied in part.

An Order follows.


<u>March 3, 2020</u>                                    _____/s/_____
Date                                                          Ellen L. Hollander
                                                                 United States District Judge