**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**
(Northern Division)

|  |  |
|---|---|
| DONALD R. PEVIA,<br><br>　　　　Plaintiff,<br><br>v.<br><br>WARDEN FRANK BISHOP, *et al.*,<br><br>　　　　Defendants. | Civil Action No. DLB-19-00327 |

**PLAINTIFF DONALD R. PEVIA'S OPPOSITION TO DEFENDANTS' MOTION TO
<u>DISMISS OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT</u>**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 2

STANDARD OF REVIEW .................................................................................................. 5

ARGUMENT ................................................................................................................... 6

    A.    A genuine dispute of material fact exists regarding whether Defendants violated the First Amendment by banning sweat lodges at NBCI............................................. 6

    B.    A genuine dispute of material fact exists regarding whether Defendants violated RLUIPA by prohibiting sweat lodge ceremonies at NBCI....................................... 11

    C.    Defendants are not entitled to qualified immunity for violating Mr. Pevia's First Amendment rights...................................................................................................... 21

    D.    The settlement in *Pevia v. Shearin* does not bar Mr. Pevia's claims in this case. ...... 22

    E.    Defendant Hill should not be dismissed. .................................................................. 23

    F.    Mr. Pevia is entitled to prospective injunctive relief. ................................................ 23

CONCLUSION................................................................................................................ 26

CERTIFICATE OF SERVICE ............................................................................................ 27

## TABLE OF AUTHORITIES

**Cases**

*Adickes v. S.H. Kress & Co.*,
   398 U.S. 144 (1970) .................................................................................................... 6

*Allen v. Toombs*,
   827 F.2d 563 (9th Cir. 1987)........................................................................................ 9

*Anderson v. Liberty Lobby Inc.*,
   477 U.S. 242 (1986) ................................................................................................. 5–6

*Bd. of Trs. of State Univ. of N.Y. v. Fox*,
   492 U.S. 469 (1989) ................................................................................................... 24

*Brown v. Plata*,
   563 U.S. 493 (2011) ................................................................................................... 23

*Buckles v. Crowe*,
   No. CV 18-00084-BLG-SPW-TJC, 2021 WL 1341887 (D. Mont. Feb. 22, 2021)................. 21

*Chance v. Texas Dep't of Crim. Just.*,
   730 F.3d 404 (5th Cir. 2013)................................................................................. 11, 18

*City of Boerne v. Flores*,
   521 U.S. 507 (1997) ................................................................................................... 18

*Cromer v. Brown*,
   88 F.3d 1315 (4th Cir. 1996)....................................................................................... 22

*Cruz v. Beto*,
   405 U.S. 319 (1972) ................................................................................................... 21

*Cty. of Sacramento v. Lewis*,
   523 U.S. 833 (1998) ................................................................................................... 16

*Cutter v. Wilkinson*,
   544 U.S. 709 (2005) ............................................................................................. 11, 20

*DePaola v. Clarke*,
   884 F.3d 481 (4th Cir. 2018)....................................................................................... 22

*Emp. Div. v. Smith*,
   494 U.S. 872 (1990) ................................................................................................... 16

*Fowler v. Crawford*,
   534 F.3d 931 (8th Cir. 2008).......................................................................... 12, 16, 17

*Gonzales v. Lischer*,
   230 F. Supp. 2d 950 (W.D. Wisc. 2002) .................................................................. 9, 10

*Haight v. Thompson*,
   763 F.3d 554 (6th Cir. 2014)................................................................................. 19, 20

*Hall v. Stouffer*,
   No. GLR-15-1008, 2018 WL 8335491 (D. Md. Sept. 25, 2018)............................... 25

*Hamilton v. Schriro*,
  74 F.3d 1545 (8th Cir. 1996) ...................................................................... 18

*Koger v. Bryan*,
  523 F.3d 789 (7th Cir. 2008) ...................................................................... 20

*Lovelace v. Lee*,
  472 F.3d 174 (4th Cir. 2006) ................................................................. passim

*Morrison v. Garraghty*,
  239 F.3d 648 (4th Cir. 2001) ...................................................................... 24

*Murphy v. Mo. Dep't of Corr.*,
  372 F.3d 979 (8th Cir. 2004) ...................................................................... 20

*Native American Council of Tribes v. Weber*,
  750 F.3d 742 (2014) ................................................................................... 24

*Pevia v. Shearin*,
  No. ELH-14-631 (D. Md. 2014) ............................................................. 2, 22

*Shaheed v. Winston*,
  885 F. Supp. 861 (E.D. Va. 1995) .............................................................. 16

*Shaw v. Hunt*,
  517 U.S. 899 (1996) ................................................................................... 19

*Spratt v. R.I. Dep't of Corr.*,
  482 F.3d 33 (1st Cir. 2007) ........................................................................ 20

*Thomas v. Gunter*,
  32 F.3d 1258 (8th Cir. 1994) ...................................................................... 21

*Thomas v. Review Bd. of Ind. Emp't Sec. Div.*,
  450 U.S. 707 (1981) ............................................................................... 6, 11

*Turner v. Safley*,
  482 U.S. 78 (1987) ............................................................................ 6, 8, 11

*Werner v. McCotter*,
  49 F.3d 1476 (10th Cir. 1995) .................................................................... 20

*Wilcox v. Brosn*,
  877 F. 3d 161 (4th Cir. 2017) ....................................................................... 6

*Yellowbear v. Lampert*,
  741 F.3d 48 (10th Cir. 2014) .......................................................... 11–12, 20

**Statutes**

18 U.S.C. § 3626 .................................................................................... 23, 24

42 U.S.C. § 2000bb–1(a), (b) ....................................................................... 18

42 U.S.C. § 2000cc–1(a) .................................................................... 11, 12, 18

42 U.S.C. § 2000cc–2(b) .............................................................................. 12

Religious Land Use and Institutionalized Persons Act,
   42 U.S.C. § 2000 ........................................................................................................ 1, 11

**Rules**

Fed. R. Civ. P. 12(b) ...................................................................................................... 1

Fed. R. Civ. P. 12(h)(2) .................................................................................................. 1

Fed. R. Civ. P. 56 ....................................................................................................... 5, 6

**Other Authorities**

Kairos Prison Ministry of Maryland, https://www.marylandkairos.org/ [permalink:
   https://perma.cc/82Y8-78FL] ........................................................................................ 8

## INTRODUCTION

Plaintiff Donald R. Pevia is an inmate currently housed at North Branch Correctional Institution ("NBCI") in Cumberland, Maryland. Mr. Pevia alleges that Defendants former Warden Frank Bishop, Warden Jeffrey Nines, former Secretary of the Maryland Department of Public Safety and Correctional Services ("DPSCS"), and former Commissioner of Corrections Wayne T. Hill violated his right to the free exercise of his Native American faith under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc *et seq.*, and the First Amendment because Defendants refuse to permit him to participate in sweat lodge ceremonies or provide sweat lodge ceremonies at NBCI generally.[1] Defendants now move for summary judgment in their favor on Mr. Pevia's claims.[2]

Defendants moved for summary judgment once before on Mr. Pevia's RLUIPA and First Amendment claims, and the Court denied their Motion because there existed "a genuine dispute of material fact as to whether the various explanations for the denial of a sweat lodge at NBCI represent the true explanations for defendants' decision." Mar. 3, 2020 Mem. Op. ["Mem. Op."] 33, ECF No. 16. Therefore, the Court held that Defendants had failed to meet their burden to establish a compelling government interest in the security of NBCI with regard to denying Mr. Pevia access to a sweat lodge. *Id.* at 34.

The evidence and arguments Defendants now put forward in their second Motion to Dismiss or, in the Alternative, Motion for Summary Judgment compel the same conclusion: There

---

[1] Mr. Pevia originally brought claims against Defendants under the Fourteenth Amendment's Equal Protection Clause for placing restrictions on the recreation and programming that he is permitted to access. Mar. 3, 2020 Mem. Op. ["Mem. Op."] 6–8, ECF No. 16. The Court dismissed these claims. *Id.* at 35–36.

[2] Defendants also move to dismiss Mr. Pevia's claims, but such a motion is procedurally improper at this stage in the litigation as Defendants have filed an Answer to the Complaint. *See* Fed. R. Civ. P. 12(b) & 12(h)(2).

are genuine disputes of material fact regarding Defendants' true reason(s) for prohibiting sweat lodge ceremonies at NBCI that preclude summary judgment in their favor. And the majority of the other arguments Defendants advance—that Defendants are entitled to qualified immunity; that the settlement agreement in *Pevia v. Shearin* bars Mr. Pevia's claims; and that Mr. Pevia is not entitled to prospective injunctive relief—are all similarly without merit.[3] Therefore, for the reasons set forth below, Defendants' second Motion to Dismiss or, in the Alternative, Motion for Summary Judgment should be denied.

## STATEMENT OF FACTS

Mr. Pevia is a Native American Faith Group ("NAFG") member and during the relevant timeframe has been classified as a Max I inmate. Ex. 1 at 4. On November 21, 2017, Mr. Pevia was transferred from NBCI to Western Correctional Institution ("WCI"), which is located next to NBCI. Ex. 1 at 1; Ex. 2. On December 21, 2017, while Mr. Pevia was housed at WCI and a maximum-security inmate, he participated in a sweat lodge ceremony. Ex. 3. On January 21, 2018, Mr. Pevia was transferred back to NBCI, which does not provide sweat lodge ceremonies. Ex. 1 at 1.

The DPSCS Religious Services Manual, issued on March 20, 2017, defines a "sweat lodge" as a "Native American ritual that utilize[es] hot coals within an inipi (a dome-shaped, wood constructed enclosure)." OPS.140.0002.03(34), Ex. 4 at 9. Appendix 12 to the DPSCS Religious Services Manual specifies that a minimum of 1,600 square feet be available for the construction of a sweat lodge. OPS.140.0002 app. 12, *id.* at 136. It also provides that Maryland correctional

---

[3] Defendants also argue that Defendants Moyer and Hill should be dismissed from this case because they did not participate in the decision to prohibit sweat lodge ceremonies at NBCI. As explained below, Mr. Pevia concedes that Defendant Moyer should be dismissed, but contends that there is a genuine dispute of material fact regarding Defendant Hill's personal participation in the decision.

facilities "will make available a minimum of three [sweat lodge] ceremonies a year, possibly coinciding with the Spring and Fall Equinox, and Summer Solstice," OPS.140.0002.09(G)(5), *id.* at 45; OPS.140.0002 app. 4, *id.* at 108–109, and that they cannot be conducted "without the presence of an approved Department volunteer," OPS.140.0002.09(G)(18), *id.* at 45 (emphasis in original). The DPSCS Religious Services Manual states that the "Sweat Lodge ceremony shall be available to the general population whose Religious Preference is Native American, providing resources and adequate circumstances permit, and only as a form of congregate worship."[4] OPS.140.0002.09(G)(2), *id.* at 44. In addition, "Sweat Lodge ceremonies are generally open to offenders in general housing, [but] they are not open to offenders on special confinement housing units. Security staff may restrict the access of offenders in general housing or treatment units if there is a compelling security reason to do so." OPS.140.0002(G)(7), *id*. Appendix 4 to the DPSCS Religious Services Manual states that sweat lodge ceremonies are "[a]vailable to general population, with exception of maximum security, disciplinary & administrative segregation, special housing units and protective custody inmates." OPS.140.0002 app. 4, *id.* at 108–09.

Inmates can submit proposals for new or additional sweat lodge ceremonies to the prison Chaplain. OPS.140.0002.09(G)(6), *id.* at 44. Sometime after the DPSCS Religious Services Manual was issued in March 2017, Norman Mayes and several other inmates that are part of the

---

[4] Defendants erroneously state that "[t]he Court notes that the Department of Public Safety and Correctional Services (DPSCS) Religious Services Manual prohibits sweat lodges at maximum security facilities although the plaintiff argues that the ban is not based on any penological interest." Defs.' Mem. in Supp. of Mot. to Dismiss or, in the Alternative, Mot. for Summ. J. ["Defs.' Mot."] at 2 (citing Mem. Op. 4–5). Both the Court's March 3, 2020 Memorandum Opinion and the DPSCS Religious Services Manual indicate that maximum security *inmates* are not permitted to participate in sweat lodge ceremonies, and Mr. Pevia contended that the ban on maximum-security inmates' participation in sweat lodge ceremonies serves no penological interest. Mem. Op. 4–5. Thus, contrary to Defendants' assertions, there is no ban on sweat lodges at maximum security institutions; the Religious Services Manual only addresses access to sweat lodge ceremonies based on an inmate's security status.

NAFG at NBCI submitted a petition to the NBCI Chaplain, Kevin Lamp, requesting that NBCI provide sweat lodge ceremonies. Ex. 5. They never received a response. *Id.*

On July 4, 2018, Mr. Pevia filed Administrative Remedy Procedure ("ARP") NBCI-0986-18, asserting that NBCI officials were denying him the ability to participate in sweat lodge ceremonies. Ex. 6 at 1. Mr. Pevia was in the general population, and not on disciplinary segregation, when he filed his ARP. Ex. 7, Pevia Decl. ¶ 9. On August 22, 2018, then-Assistant Warden, Defendant Nines, dismissed Mr. Pevia's ARP because he was "a maximum security inmate and currently on disciplinary segregation" and "[p]er OPS.140.0002 Appendix 4, Worship Practices for Groups, Sweat Lodge Ceremony, a sweat lodge ceremony is 'available to general population with the exception of maximum security, disciplinary and administrative segregation, special housing units, and protective custody inmates.'" Ex. 6 at 1.

On September 15, 2018, Mr. Pevia appealed the dismissal of his ARP. Ex. 8. On October 15, 2018, then-Commissioner, Defendant Hill, dismissed Mr. Pevia's appeal. *Id.* at 3. On November 1, 2018, Mr. Pevia appealed the dismissal of his ARP to the Inmate Grievance Office ("IGO"). Ex. 9. On December 21, 2018, the IGO dismissed Mr. Pevia's appeal. Ex. 10.

On February 1, 2019, Mr. Pevia sued Defendants, alleging, in part, that their failure to provide him access to a sweat lodge at NBCI violated RLUIPA and his First Amendment right to the free exercise of his Native American faith. (ECF No. 1). On June 24, 2019, Defendants filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. (ECF No. 10). On March 3, 2020, the Court, construing Defendants' Motion as a motion for summary judgment, granted in part and denied in part the Motion. (ECF No. 16).

In their initial Motion, Defendants advanced five reasons for refusing to provide Mr. Pevia access to a sweat lodge at NBCI: (1) NBCI does not have sufficient space; (2) NBCI does not have

sufficient resources; (3) Mr. Pevia cannot participate in sweat lodge ceremonies because he is a maximum security inmate; (4) Mr. Pevia's disciplinary record bars him from participation in sweat lodge ceremonies; and (5) transporting Mr. Pevia to another correctional facility to participate in sweat lodge ceremonies would burden NBCI with the costs of transportation. Mem. Op. 31–33. In denying Defendants' Motion as to the First Amendment and RLUIPA claims, the Court noted that Defendants' reasons were "conclusory and contradictory assertions regarding their inability to provide a sweat lodge at NBCI" and that they "appear to be little more than after-the-fact rationalizations, which are entirely unsupported by the record evidence." Mem. Op. 31, 33. Therefore, the Court concluded that "there is a genuine dispute of material fact as to whether the various explanations for the denial of a sweat lodge at NBCI represent the true explanations for defendants' decision."[5] Mem. Op. 33.

On August 17, 2020, Defendants filed an Answer to the Complaint (ECF No. 38), and the Parties entered discovery. On April 27, 2021, Defendants filed a second Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. (ECF No. 56).

## STANDARD OF REVIEW[6]

Rule 56 of the Federal Rules of Civil Procedure mandates that summary judgment be entered when the evidence shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material fact" is one that might affect the outcome of a party's case and is determined by the substantive law. *Anderson*

---

[5] The Court also concluded that Mr. Pevia had met his burden under RLUIPA and the First Amendment of establishing that Defendants' ban on sweat lodge ceremonies is a substantial burden on the practice of his religion. Mem. Op. at 31.

[6] Plaintiff includes only the standard of review for motions for summary judgment because a motion to dismiss is procedurally improper at this stage in the litigation. *See* Fed. R. Civ. P. 12(b) & 12(h)(2).

*v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). Courts should deny a motion for summary judgment unless the evidence, viewed in the light most favorable to the non-moving party, demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Anderson*, 477 U.S. at 250. The moving party bears the burden of demonstrating the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" must be left for trial and must not be decided on a motion for summary judgment. *Anderson*, 477 U.S. at 255. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.*

## ARGUMENT

**A.    A genuine dispute of material fact exists regarding whether Defendants violated the First Amendment by banning sweat lodges at NBCI.**

To state a claim for violation of the First Amendment's Free Exercise Clause, a plaintiff must first demonstrate that: (1) he holds a sincere religious belief; and (2) a prison practice or policy places a substantial burden on his ability to practice his religion. *See Wilcox v. Brosn*, 877 F. 3d 161, 168 (4th Cir. 2017) (citing *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981)). Defendants do not argue that Mr. Pevia has not sustained his burden, nor could they, because the Court already concluded that he has. Mem. Op. at 29–30. Thus, the burden is on Defendants to demonstrate that the regulation in question is "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). In assessing the reasonableness of a regulation, courts consider four factors: (1) whether there is a "'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) whether there is an alternative means of exercising the asserted constitutional right; (3) the impact accommodation of the right will have on guards and other inmates, and the allocation of

prison resources generally; and (4) the absence of ready alternatives to the challenged regulation. *Id.* As in their previous Motion for Summary Judgment, Defendants again fail to sustain their burden of establishing the reasonableness of an outright ban on sweat lodge ceremonies at NBCI.

As to the first factor, Defendants assert that "their conduct was premised upon sound penological reasoning: based upon NBCI's highest security classification in the State penal system and its physical design, a Sweat Lodge cannot be safely housed on its compound." Defs.' Mem. in Supp. of Mot. to Dismiss or, in the Alternative, Mot. for Summ. J. ["Defs.' Mot."] 10. But this cannot be the case, as these reasons are not reflected in the record evidence. Defendant Nines dismissed Mr. Pevia's ARP requesting access to a sweat lodge ceremony because "Investigation found that you are a maximum security inmate and currently on disciplinary segregation. Per OPS.140.0002 Appendix 4, Worship Practices for Groups, Sweat Lodge Ceremony, a sweat lodge ceremony is 'available to general population with the exception of maximum security, disciplinary and administrative segregation, special housing units, and protective custody inmates.'" Ex. 6 at 1. Notably this denial of Mr. Pevia's request to access sweat lodge ceremonies was based on his security status, not the security status or design of NBCI, which is why the Court has already rejected this proffered justification. *See* Mem. Op. 32 (concluding that this "cannot be the reason why no sweat lodge has been built at NBCI, given that a sweat lodge is available at WCI, a maximum-security facility adjacent to NBCI, and the facility where plaintiff previously participated in a sweat lodge ceremony while classified as a maximum-security inmate"). In addition, the evidence—and the reasons—Defendants now put forward in their second Motion for Summary Judgment were absent from their first Motion for Summary Judgment and appeared for the first time during discovery and in the Declaration from Defendant Nines attached to this Motion. *Compare* Mem. Op. 30–32, *with* Defs. Mot. Ex. 2, Nines Decl., *and* Ex. 11, *and* Ex. 12.

This evidence stands in stark contrast to the evidence in the record reflecting WCI's and Eastern Correctional Institution's decisions to provide sweat lodge ceremonies at their facilities. Ex. 13.

As to the remaining three factors, Defendants put forward no evidence of alternative ways Mr. Pevia may engage in exercising his First Amendment free exercise rights to a sweat lodge, the absence of ready alternatives, or the impact that permitting a sweat lodge ceremony a minimum three times a year would have on inmates and personnel at NBCI. *See Turner*, 482 U.S. at 89. Mr. Pevia, by contrast, has put forward maps and diagrams of NBCI illustrating where sweat lodge ceremonies could be held, *see* Pevia Decl. ¶ 10; *id.* Ex. E; Exs. 14–16, in comparison to the area where sweat lodge ceremonies are held at WCI, *see* Pevia Decl. ¶ 6 ; *id.* Exs. C & D. In addition, as Mr. Pevia attests (and which is illustrated by the diagrams and pictures he produced), inmate and prison personnel traffic that Defendants assert would interfere with sweat lodge ceremonies actually moves towards the center of the NBCI compound (towards the Chow Hall and the Support Services Building) and away from where sweat lodge ceremonies could be held. Pevia Decl. ¶ 10; *id.* Ex. E. Further, twice a year NBCI permits Kairos, a Christian ministry,[7] to host services and other activities over four days in the Support Services Building for about thirty inmates that have been approved to attend (stating that Kairos services take place Thursday from 4:00 p.m. to 7:00 pm, Friday and Saturday from 7:30 a.m. to 8:00 p.m., and Sunday from 7:30 a.m. to 4:00 p.m.). Ex. 17 at 1; Pevia Decl. ¶ 11. It is reasonable to infer that shutting down the entire Support Services Building—where inmates go for essential services—for nearly four days causes disruptions in the inmate movement schedule at NBCI, but Defendants nevertheless do so in order for Kairos to hold

---

[7] *See* Kairos Prison Ministry of Maryland, https://www.marylandkairos.org/ [permalink: https://perma.cc/82Y8-78FL] (last visited May 9, 2021). "The mission of Kairos Prison Ministry is to share the transforming love and forgiveness of Jesus Christ to impact the hearts and lives of incarcerated men, women and youth, as well as their families, to become loving and productive citizens in their communities. *Id.*

its events at least twice a year. Thus, it cannot be that the movement schedule at NBCI prevents the construction of a sweat lodge at the facility.

Defendants also attempt to find support in case law for their post hoc rationalizations for the sweat lodge ban. They rely on *Allen v. Toombs*, 827 F.2d 563 (9th Cir. 1987) and *Gonzales v. Lischer*, 230 F. Supp. 2d 950 (W.D. Wisc. 2002), to argue that summary judgment should be granted in their favor based on security concerns. Defs.' Mot. 10. Defendants' reliance on these cases is misplaced. In *Toombs*, inmates in a disciplinary segregation unit sought access to an existing sweat lodge at the prison—there was not an outright ban on sweat lodge ceremonies at the facility. 827 F.2d at 567. The *Toombs* defendants also put forth evidence that the ceremony "requires the use of an axe to chop wood for a fire, red hot stones to heat the lodge, and a pitchfork to transport the stones from the fire to the lodge interior" and that these materials involve a substantial security risk, which is magnified when inmates on disciplinary segregation are given access to the sweat lodge. *Id.* Here, Defendants do not put forth any such evidence regarding the sweat lodge ceremony and its potential security risks, and the DPSCS Religious Services Manual lists the items necessary to conduct a sweat lodge ceremony (which does not include an axe, a pitchfork, or stones):

    (a)    Pipes;

    (b)    Rattles;

    (c)    Hand drum; drumsticks (one per drum);

    (d)    Bone whistles;

    (d)    Medicines used for ceremony and smudging;

    (e)    Prayer feathers or fans;

    (f)    Medicine bags;

      (h)     Ceremonial item for the altar (i.e. buffalo skull, prayer sticks, other ceremonial sacred items necessary for the ceremony);

      (i)     Tote bag for carrying clothing (including sweat shirt, shorts, towel, comb or clean socks, underwear, etc.).

OPS.140.0002.09(H)(2), Ex. 4 at 47. The items identified in *Toombs* also do not appear on the "Sweat Lodge Ceremony Checklist." OPS.140.0002 app. 10, *id.* at 133. In addition, unlike the plaintiffs in *Toombs*, Mr. Pevia was not in disciplinary segregation at the time he filed his ARP requesting access to sweat lodge ceremonies at NBCI. Pevia Decl. ¶ 9.

Similarly, *Gonzales* involved an inmate "in the most restrictive status at Wisconsin's highest security prison" and relied on other courts' holdings that "legitimate security concerns justify prohibiting Native American inmates in segregated confinement from having access to a sweat lodge." 230 F. Supp. 2d at 960. Here, Mr. Pevia was not on disciplinary segregation when he filed his ARP regarding his lack of access to a sweat lodge and he was permitted to participate in a sweat lodge ceremony—and did so without incident and when he was a maximum-security inmate—while housed at WCI. Ex. 1 at 1; Ex. 3 at 1. Beyond invoking NBCI's high-security classification, Defendants have put forth no concrete evidence of the security risk of holding sweat lodge ceremonies at NBCI. Instead, Defendants have repeatedly put forth conclusory and contradictory explanations for denying Mr. Pevia access to sweat lodge ceremonies. The Court should not credit Defendants' post hoc justifications. *See Lovelace v. Lee*, 472 F.3d 174, 190 (4th Cir. 2006) (holding, with regard to the plaintiff's RLUIPA claim, that "[g]iven the superficial nature of the defendants' explanation, we cannot at this stage conclude that the asserted interest is compelling as a matter of law").

Defendants have again failed to demonstrate that an outright ban on sweat lodge ceremonies is rationally related to a legitimate penological interest. *See* Mem. Op. 31

("[Defendants'] explanations [do not] demonstrate that the denial of a sweat lodge is related to a legitimate penological objective under the standard in *Turner v. Safely*. . . ."). Because there are genuine disputes of material fact regarding Defendants' true reasons for prohibiting sweat lodge ceremonies at NBCI and whether those reasons are related to a legitimate penological interest, the Court should deny Defendants' motion for summary judgment on Mr. Pevia's First Amendment claim.

**B.      A genuine dispute of material fact exists regarding whether Defendants violated RLUIPA by prohibiting sweat lodge ceremonies at NBCI.**

In enacting RLUIPA, Congress intended to grant prisoners "greater protection of religious exercise than what the Constitution itself affords" because "inmates are subject to 'a degree of [governmental] control unparalleled in civilian society and severely disabling to private religious exercise,'" *Lovelace*, 472 F.3d at 186 (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 720–21 (2005)). As a result, RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability," unless the government demonstrates that the burden is "in furtherance of a compelling governmental interest" and is "the least restrictive means of furthering that . . . interest." Religious Land Use and Institutionalized Persons Act of 2000, § 3(a), 42 U.S.C. § 2000cc–1(a). A "substantial burden" is one that "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Lovelace*, 472 F.3d at 187 (quoting *Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 718 (1981)).

A RLUIPA claim requires a "fact specific inquiry that takes into account the special circumstances of the individual prisoner and prison" regarding whether a prison's policy is the least restrictive means of furthering a government's interests. *Chance v. Texas Dep't of Crim. Just.*, 730 F.3d 404, 411 (5th Cir. 2013); *see also Yellowbear v. Lampert*, 741 F.3d 48, 57 (10th Cir.

11

2014) ("The statute says the government must prove the 'compellingness' of its interest in the context of 'the burden on *that person*'—suggesting an inquiry that proceeds in light of the particular burden the government has placed on the particular claimant before us." (emphasis in original) (citing 42 U.S.C. § 2000cc–1(a)); *Fowler v. Crawford*, 534 F.3d 931, 941 (8th Cir. 2008) (noting that a categorical rule defining the relevance of another prison's policy ignores the differences between institutions and all the other factors that might be more relevant in a given case).

In its March 3, 2020 Memorandum Opinion, the Court concluded that NBCI's outright ban on sweat lodge ceremonies was a substantial burden on Mr. Pevia's practice of his Native American faith, Mem. Op. 29–30, and Defendants do not argue otherwise in their present Motion. Thus, the burden is on Defendants to prove that NBCI's policy banning sweat lodge ceremonies furthers a compelling governmental interest and is the least restrictive means of doing so. *Lovelace*, 472 F.3d at 191 (citing 42 U.S.C. § 2000cc–2(b)). Defendants have failed to sustain their burden.

Defendants assert that "[b]ased on the design and layout of NBCI, it was determined that NBCI is unable to provide a sweat lodge that met the requirements and parameters established in the DPSCS Religious Services Manual." Defs.' Mot. 4 (citing Defs.' Mot. Ex. 2, Nines Decl. ¶ 7). Specifically, "[t]he space requirement, the facility movement schedule, the security level of the facility, and the inmates who are housed here create too much of a security risk to provide a sweat lodge at NBCI." Defs.' Mot. 4 (quoting Defs.' Mot. Ex. 2, Nines Decl. ¶ 7). But Defendants have not produced evidence reflecting that the design and layout of NBCI render the facility unsuitable for sweat lodge ceremonies. The decision to prohibit sweat lodge ceremonies due to NBCI's design and layout is also not reflected in the original reason for denying Mr. Pevia's ARP—his security status—or the other reasons Defendants put forth in their first Motion for Summary Judgment.

And, as noted above, Defendants offered these new reasons for the first time during discovery and in the Declaration from Defendant Nines attached to their Motion. *Compare* Mem. Op. at 30–32, *with* Defs. Mot. Ex. 2, Nines Decl., *and* Ex. 11, *and* Ex. 12.

Defendants next contend that "the lack of adequate space on the NBCI compound for a sweat lodge both prevents the privacy required for the sweat lodge ceremony and smoke from the sweat lodge fire may enter the housing units." Defs.' Mot. at 4 (citing Nines Decl. ¶ 7). They assert that "[t]he only potential location is between Housing Units 3 and 4, and the recreation yard they share between them, but there would be no four hours of interrupted time." *Id.* at 4–5 (citing Nines Decl. ¶ 8). Defendants explain, "There would be movement on the compound for meal time and various appointments by non-Native American members that pose a security risk to inmates and the staff assigned to observe the service or the space [where] the service was conducted." Defs.' Mot. at 5 (citing Part B Response memo from Bobby Shearin, Retired NBCI Warden, on August 15, 2011 in response to ARP NBCI 1616-11).

To support their arguments, Defendants rely on former-Warden Shearin's response to an ARP filed by Kenneth Trice, another inmate at NBCI, regarding NBCI's failure to provide NAFG services at the facility. Defs.' Mot. at 5. But Shearin's response to Mr. Trice's ARP is wholly unconnected to Defendants' reasons for prohibiting a sweat lodge at NBCI, and even if it were connected in some way, the response does not withstand scrutiny. Despite former-Warden Shearin's explanation in response to Trice's ARP that NBCI "does not have a grassy area that is not right up against a housing unit or security fence," that NBCI has "no place to put [the NAFG] that would be free from interference with the security of the institution," and that NBCI "cannot safely and securely give [the NAFG] the outside space they need to worship," Defs' Mot. Ex. 2 at 14, NBCI ultimately ended up permitting congregate worship for NBCI's NAFG in 2014, Pevia

13

Decl. ¶ 3. In addition, former-Warden Shearin's response is dated August 15, 2011, Defs' Mot. Ex. 2 at 14, but the Religious Services Manual that details the parameters for sweat lodge ceremonies at Maryland correctional institutions was not in effect until March 20, 2017. Ex. 4 at 1. Thus, Shearin's reasons for not permitting NAFG congregate worship at NBCI pre-date the Religious Services Manual's sweat lodge guidance by nearly six years. Further, the diagrams and pictures Mr. Pevia has put forth show where NAFG services are held, Exs. 14–16; Pevia Decl. Exs. A & E, during which time the NAFG builds a fire, and there is no evidence in the record that NBCI officials have ever expressed concern about the smoke from NAFG ceremonies wafting into the adjacent housing units.

Defendants also contend that "[d]ue to NBCI's security classification which reflects the highest potential for inmate violence, inmate movement within NBCI and on its compound is significantly restricted by its physical design. These factors prohibit the provision of a sweat lodge at NBCI."[8] Defs.' Mot. 3 (citing Nines Decl. ¶ 4). Defendants do not, however, detail the specifics of NBCI's design that prevent sweat lodge ceremonies from being held at the facility. A diagram of NBCI that Defendants produced demonstrates that there is ample area in which to construct a sweat lodge, *see* Ex. 16, and inmates would in fact be moving away from the area where the sweat lodge ceremonies would be held to go to the Chow Hall and access other services in the Support Services Building located at the center of NBCI, Pevia Decl. ¶ 10; *id.* Ex. E.

---

[8] Defendants also seem to imply that Mr. Pevia could request a transfer to WCI or Eastern Correctional institution ("ECI"), both of which hold sweat lodge ceremonies. *See* Defs.' Mot. 5 ("Sweat lodges are available at WCI and ECI. Inmates are able to request a transfer to another facility of the same security level they are currently assigned, but these are now limited due to COVID." (citation omitted)). Defendants do not put forth any evidence that a request by Mr. Pevia for transfer to WCI or ECI would be granted. More importantly, the fact that Mr. Pevia may request a transfer to a different correctional institution that permits sweat lodge ceremonies does not alleviate Defendants of their responsibility for providing a sweat lodge at NBCI.

Defendants assert that the only place where a sweat lodge could be located at NBCI is between Housing Units 3 and 4—the very place Mr. Pevia identified—but that this location would not provide the four hours of uninterrupted time the DPSCS Religious Services Manual requires for sweat lodge ceremonies.[9] The DPSCS Religious Services Manual requires that the outdoor NAFG worship area—including the area for sweat lodge ceremonies—"be situated in an area that affords as much privacy as possible given the custody and security level of the institution," OPS.140.0002.09(G)(20), Ex. 4 at 136—it does not require four hours of uninterrupted time. Even if Defendants are unable to provide four hours of uninterrupted time for sweat lodge ceremonies, that does not mean that they do not need to provide a sweat lodge at all—it simply means that only a certain level of privacy is possible given the custody and security levels of NBCI. Pre-COVID-19 restrictions on congregate worship, NBCI permitted the NAFG to engage in congregate worship in the very same location once a week for an hour and a half, including burning a fire. Pevia Decl. ¶ 4. Defendants put forth no evidence that extending that time to four hours, a minimum of three times a year, would pose a security threat, especially when NBCI already posts a guard nearby for the NAFG ceremonies, Pevia Decl. ¶ 4, and a volunteer from Iron House Council would be present to conduct the sweat lodge ceremony, *see* OPS.140.0002.09(G)(18), Ex. 4 at 46. Instead, Defendants again provide post hoc justifications for prohibiting sweat lodge ceremonies at NBCI that this Court should not credit. *See Lovelace*, 472 F.3d at 190. Further, twice a year NBCI shuts down its Support Services Building for nearly four days for Kairos services. *See supra* at 9. It strains credulity to believe that NBCI is able to shut down a central portion of its facility that inmates go to for food, recreation, and medical services for close to four days, but it cannot allow

---

[9] Defendants do not contend that NBCI does not have sufficient space—1,600 square feet—for the construction of a sweat lodge. *See* Defs.' Mot. 9–13; *id.* Ex. 2, Nines Decl. ¶ 8.

sweat lodge ceremonies three times per year, for four hours each time, in an area that would not require such a complete shut-down.

Next, relying on *Lovelace*, Defendants contend that Mr. Pevia must prove that they intentionally interfered with the exercise of his religion to be held liable under RLUIPA. Defs.' Mot. 11. Defendants misread *Lovelace*. In *Lovelace*, the United States Court of Appeals for the Fourth Circuit held that a simple tort-law negligence standard was not sufficient to establish monetary liability against prison officials sued under RLUIPA in their individual capacity. *Lovelace*, 472 F.3d at 194 (citing *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 848–49 (1998)). The Fourth Circuit concluded that RLUIPA "at least reaches intentional conduct," but it declined to reach the question of whether deliberate indifference is sufficient to obtain damages under the statute. *Id.* at 194–95 (first citing *Emp. Div. v. Smith*, 494 U.S. 872, 890 (1990); and then citing *Shaheed v. Winston*, 885 F. Supp. 861, 868 (E.D. Va. 1995)). *Lovelace*, therefore, does not preclude the injunctive relief Mr. Pevia seeks against Defendants in their official capacity.

The other cases Defendants rely on are similarly inapposite. In *Fowler v. Crawford*, 534 F.3d 931 (8th Cir. 2008), the plaintiff inmate demanded an outdoor meeting area with access to a sweat lodge a minimum of 17 times a year. *Id.* at 933. The defendants submitted evidence that incidents of violence had occurred at the prison "during call-out times for religious services" and that because the NAFG at the institution did not have regular volunteers from outside the prison to oversee the services, such a group posed a particular security risk as its "meeting times [could] be used for inappropriate purposes." *Id.* at 935. The defendants also submitted evidence of specific instances of violence and sexual misconduct occurring at religious services. *Id.* In denying the plaintiff's request for a sweat lodge, prison officials explained that the nature of the sweat lodge ceremony, which included fire, large hot rocks, and tools such as shovels, posed a "significant

security risk," including the "risk of sexual misconduct, physical assault, and drug use, as well as fire and heat-related safety concerns." *Id.* The defendants also explained that the sweat lodge would "consume considerable institutional financial and personnel resources" and "expend many institutional personnel hours," and cited a resulting "risk of resentment among the inmate population leading to the potential for unrest and disturbance." *Id.*

Here, Defendants put forth no such evidence or explanations, and instead rely on conclusory and contradictory assertions that have changed over the course of this litigation. For example, Defendants have produced no evidence of the items used at a sweat lodge ceremony and how they may pose a security risk, nor have they detailed any previous incidents of sexual misconduct, physical assault, and drug use during NAFG ceremonies at NBCI or any other Maryland facility. They also have not produced any evidence that holding sweat lodge ceremonies up to three times a year, for four hours each time, would be a drain on NBCI's financial or personnel resources, and, in fact, have abandoned their previous contention to that effect. *Compare* Mem. Op. 31 ("Defendants also claim in their Motion that NBCI is without sufficient resources to provide a sweat lodge, but they do not identify what those resources would be. Defendants do not even attempt to quantify the costs faced in constructing and supervising a sweat lodge, nor explain how such costs would impinge on prison budgets or administration." (citation omitted)), *with* Def. J. Nines Ans. to Pl.'s Interrog. No. 13, Ex. 11 (attesting that he does not contend that NBCI does not have sufficient financial resources to construct a sweat lodge). In addition, unlike *Fowler*, the DPSCS Religious Services Manual does not permit a sweat lodge ceremony to be conducted "without the presence of an approved <u>Department</u> volunteer." OPS.140.0002.09(G)(18), Ex. 4 at 45. Iron House Council, the approved volunteer group that provides congregate worship services for the NAFG at NBCI, would assist with the sweat lodge ceremonies, Ex. 5, which would help

prevent sexual misconduct, physical assault, and drug use (though Defendants proffer no evidence

that such incidents have occurred at sweat lodge ceremonies or NAFG services). Further, Mr. Pevia

seeks only the minimum of three sweat lodge ceremonies a year permitted by the DPSCS Religious

Services Manual, not the 17 Fowler requested.[10]  Pevia Decl. ¶ 12.

Defendants' reliance on *Hamilton v. Schriro*, 74 F.3d 1545 (8th Cir. 1996), is also

misplaced.[11] In *Hamilton*, the defendants put forward testimony from several corrections officials

regarding the specific security concerns of holding sweat lodge ceremonies at the correctional

facility in that case. For example, one official testified that "implements requested by Hamilton to

conduct the sweat lodge ceremony, such as a shovel and an axe, could be used to assault other

inmates and prison guards." *Id.* at 1548. Another prison official testified that "inmates who work

with tools are supervised by prison guards" and that "[t]he secluded nature of the sweat lodge

would make such supervision impossible, thus providing the inmates with an opportunity to assault

other inmates, make weapons, use drugs, dig a tunnel, and engage in homosexual activity." *Id.*

Defendants have not produced any such evidence here, and the list of items necessary to conduct

a sweat lodge ceremony in the DPSCS Religious Services Manual does not include either an axe

or a shovel. *See* OPS.140.0002.09(H)(2), Ex. 4 at 47. Those items do not appear on the "Sweat

Lodge Ceremony Checklist," either. OPS.140.0002 app. 10, *id.* at 134. In short, Defendants put

---

[10] Defendants also cite *Chance v. Texas Dep't of Crim. Just.*, 730 F.3d 404 (5th Cir. 2013), but this case is similarly inapposite and actually supports Plaintiff's argument that the Court must engage in an individualized analysis of each RLUIPA claim. *Id.* at 411.

[11] *Hamilton* involved claims under the First Amendment and the Religious Freedom Restoration Act, RLUIPA's predecessor statute that had the same test for assessing government regulation of the free exercise of religion—a government regulation that substantially burdens a person's free exercise of religion must be: (1) in furtherance of a compelling governmental interest; and (2) the least restrictive means of furthering that compelling governmental interest. *Compare* 42 U.S.C. § 2000cc–1(a), *with* 42 U.S.C. § 2000bb–1(a), (b) (held unconstitutional by *City of Boerne v. Flores*, 521 U.S. 507, 535 (1997)).

forth no evidence of any security risks, much less evidence that such security risks justify an outright ban on sweat lodge ceremonies at NBCI.

Defendants have previously proffered at least six different explanations for the prohibition on sweat lodge ceremonies at NBCI, all of which they have now abandoned. First, Defendant Nines denied Mr. Pevia's ARP requesting a sweat lodge because he was "a maximum security inmate currently on disciplinary segregation," and therefore he was "not permitted access to a sweat lodge ceremony," per the Religious Services Manual. Ex. 6 at 1. In their initial Motion for Summary Judgment, Defendants asserted five new reasons for prohibiting sweat lodges at NBCI: (1) NBCI does not have sufficient space to construct a sweat lodge; (2) NBCI does not have sufficient resources to provide a sweat lodge; (3) Mr. Pevia cannot participate in sweat-lodge ceremonies because he is a maximum-security inmate; (4) Mr. Pevia's disciplinary record; and (5) transporting Mr. Pevia to sweat lodge services at another institution where they are available would burden DPSCS. *See* Mem. Op. 31–32. The Court rejected all of these reasons as "conclusory contentions" that "appear to be little more than after-the-fact rationalizations, which are entirely unsupported by the record evidence." *Id.* at 33. Now, Defendants argue that the design of NBCI itself is not conducive to holding sweat lodge ceremonies because there is no space allowing four hours of uninterrupted NAFG worship and smoke from the sweat lodge ceremony will waft into the housing units. Once again, "there is a genuine dispute of material fact as to whether the various explanations for the denial of a sweat lodge at NBCI represent the true explanations for defendants' decision." *Id.* Defendants' shifting explanations create an even greater dispute that precludes summary judgment. *See Haight v. Thompson*, 763 F.3d 554, 562 (6th Cir. 2014) (citing *Shaw v. Hunt*, 517 U.S. 899, 908 n.4 (1996)) ("[E]xplanations offered for the first time in litigation ought to come with a truth-in-litigating label, requiring the official to

disclose whether the new explanations motivated the prison officials at the time of decision or whether they amount to post hoc rationalizations. Only the true explanations for the policy count. . . . 'To be a compelling interest, the State must show that the alleged objective was the . . . "actual purpose" for the [government's action].'")); *Koger v. Bryan*, 523 F.3d 789, 800 (7th Cir. 2008) ("We can only give deference to the positions of prison officials as required by *Cutter* . . . when the officials have set forth those positions and entered them into the record."); *Spratt v. R.I. Dep't of Corr.*, 482 F.3d 33, 39 (1st Cir. 2007) ("[T]o prevail on summary judgment, [a prison] 'must do more than merely assert a security concern.'" (quoting *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 988 (8th Cir. 2004)); *Werner v. McCotter*, 49 F.3d 1476, 1480 (10th Cir. 1995) ("[T]he state must do more than simply offer conclusory statements that a limitation on religious freedom is required for security, health or safety in order to establish that its interests are of the 'highest order.'" (citation omitted)); *see also Yellowbear*, 741 F.3d at 59 ("When weighing the existence of a compelling interest, the deference due prison administrators may be enough to nudge a questionable case across the line, but it doesn't mean prison officials get to recognize compelling interests on their own."). Further, some courts have found as a matter of law that the government does not have a compelling interest in an absolute prohibition on sweat lodges. *See Haight*, 763 F.3d at 564 (collecting cases).

Because genuine disputes of material fact exist regarding whether the reasons Defendants advance for prohibiting a sweat lodge at NBCI are the true reasons and whether an outright ban on sweat lodges at NBCI is narrowly tailored to address those concerns, the Court should deny Defendants' motion for summary judgment on Mr. Pevia's RLUIPA claim.

**C.     Defendants are not entitled to qualified immunity for violating Mr. Pevia's First Amendment rights.**

Defendants contend that there is no clearly established First Amendment right for prisoners to have access to a sweat lodge. Defs.' Mot. 8. Defendants overlook the fact that this Court already concluded that "[Mr. Pevia]'s constitutional right was well established at the relevant time" and that there only exists a material dispute of fact regarding whether the denial of access to a sweat lodge violated Mr. Pevia's rights under the First Amendment or RLUIPA. Mem. Op. 34. Defendants do not give the Court any reason to disturb this holding.

Defendants rely on *Buckles v. Crowe*, No. CV 18-00084-BLG-SPW-TJC, 2021 WL 1341887 (D. Mont. Feb. 22, 2021), *report and recommendation adopted*, No. CV 18-84-SPW-TJC, 2021 WL 1171672 (D. Mont. Mar. 29, 2021), but their reliance is misplaced. First, Buckles did not attempt to substantively address the defendants' qualified immunity arguments, and instead urged the court not to apply qualified immunity. *Id.* at *4. Nor did he cite to any cases in his brief to show that the defendants had violated a clearly established right. *Id.* Thus, the issue of whether access to a sweat lodge is a clearly established right was not properly briefed for the court. Second, Defendants take too narrow a view of when a right is clearly established. Instead of examining whether prisoners' access to a sweat lodge was a clearly established right at the time, the proper inquiry is whether the First Amendment free exercise of religion is a clearly established right. *See Thomas v. Gunter*, 32 F.3d 1258, 1261 (8th Cir. 1994). The answer to this question is an unequivocal "yes." *See, e.g.*, *Cruz v. Beto*, 405 U.S. 319, 322 (1972) (per curiam) (holding that prison officials may not deny an inmate "a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts").

Finally, even if Defendants are entitled to qualified immunity (they are not), this doctrine only applies to bar Mr. Pevia from seeking damages from Defendants in their individual

capacities—it does not apply to his request for injunctive relief. *Cromer v. Brown*, 88 F.3d 1315, 1332 (4th Cir. 1996).

**D.    The settlement in *Pevia v. Shearin* does not bar Mr. Pevia's claims in this case.**

Defendants contend that Mr. Pevia's claims extending three years from August 2, 2016, the effective date of the settlement agreement in *Pevia v. Shearin*, No. ELH-14-631 (D. Md. 2014), should be barred. Defendants misread the settlement agreement.

The release provision in the settlement agreement states that:

> Pevia does hereby release and discharge the Defendant and the DPSCS and its officers, . . . from any and all claims and demands of whatever nature, actions and causes of action, damages, costs, expenses and compensation, whether known or unknown to the parties, in connection with any of the acts or omissions set forth in this Lawsuit…. Nothing in this Agreement shall be construed as to waive any claim or cause of action that Mr. Pevia has against Defendant, DPSCS and/or the State, whether known or unknown, asserted or unasserted, that does not arise out of the facts giving rise to the causes of action in this Lawsuit.

Ex. 18 at 2–3. *Pevia v. Shearin* involved whether NBCI must make NAFG congregate religious services available to Mr. Pevia; it did not implicate Defendants' refusal to provide a sweat lodge. *See Pevia v. Shearin*, ELH-14-631, Complaint, ECF No. 1. Nor could it, because the DPSCS Religious Services Manual that sets forth the guidelines for sweat lodge ceremonies did not go into effect until March 20, 2017, Ex. 4 at 1, after the parties in *Pevia v. Shearin* settled, Ex. 18 at 5. Thus, the facts in this case do not arise out of the facts giving rise to the causes of action in *Pevia v. Shearin*, meaning that the settlement agreement does not bar Mr. Pevia's claims in this case—even those claims that accrued before the end of the three-year term of the settlement agreement.[12]

---

[12] Even if the settlement agreement applies to the claims at issue in this case (it does not), Defendants' continued refusal to provide Mr. Pevia access to sweat lodge ceremonies at NBCI is an ongoing violation, and any claims that accrued after the three-year term of the settlement agreement, which expired on August 2, 2019, are viable. *See DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018) (applying continuing violation theory—a situation when "a harm has occurred

**E.     Defendant Hill should not be dismissed.**

Defendants argue that Defendant Hill should be dismissed because he was not personally involved in the alleged violation of Mr. Pevia's right to the free exercise of his Native American faith.[13] Defs.' Mot. at 14. Defendant Hill should not be dismissed because, despite his declaration attesting that he did not personally participate in the decision to deny Mr. Pevia the ability to participate in sweat lodge ceremonies, he signed Mr. Pevia's ARP appeal, reflecting his receipt of the document and his decision to dismiss it. Ex. 8. Thus, a genuine dispute of material fact exists as to whether Defendant Hill personally participated in the decision to deny Mr. Pevia access to sweat lodge ceremonies.

**F.     Mr. Pevia is entitled to prospective injunctive relief.**

Contrary to Defendants' exhortations that federal courts should not interfere with the management and administration of state prisons, the Prison Litigation Reform Act ("PLRA") permits federal courts to enter prospective injunctive relief with respect to prison conditions that "extend[s] no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1). To grant prospective injunctive relief, the court must find that "such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." *Id.*; *see also Brown v. Plata*, 563 U.S. 493, 531 (2011) ("The scope of the remedy must be proportional to the scope of the violation, and the order must extend no further

---

more than once in a continuing series of acts or omissions"—to a prisoner's claims of deliberate indifference to his medical needs).

[13] Defendants argue that Defendant Stephen T. Moyer, former Secretary of DPSCS, should also be dismiss on the grounds that he was not personally involved in the decision not to permit sweat lodge ceremonies at NBCI. Defs.' Mot. at 14. Mr. Pevia concedes that there is no evidence in the record reflecting his involvement in the decisions, and he should therefore be dismissed.

than necessary to remedy the violation."). Narrow tailoring requires a "'fit' between the [remedy's] ends and the means chosen to accomplish those ends." *Brown*, 563 U.S. at 531 (alteration in original) (quoting *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)). As part of this analysis, a court "shall give substantial weight to any adverse impact on public safety or the operation of the criminal justice system caused by the relief." 18 U.S.C. § 3626(a)(1).

Courts have ordered prospective injunctive relief similar to that Mr. Pevia seeks here. For example, in *Native American Council of Tribes v. Weber*, the plaintiffs, a Native American organization and inmates at the South Dakota State Penitentiary, sued prison officials, alleging that the prison's policy banning the use of tobacco during Native American religious services violated RLUIPA. 750 F.3d 742, 744–45. The district court found in favor of the plaintiffs and entered an order mandating certain policies and procedures to remedy the RLUIPA violation, including permitting the use of tobacco at Native American religious ceremonies. *Id.* at 753 n.9. The United States Court of Appeals for the Eighth Circuit affirmed the district court's order on appeal, concluding that it comported with the PLRA's requirement that prospective injunctive relief be narrowly tailored. *Id.* at 754. *See also Morrison v. Garraghty*, 239 F.3d 648, 661 (4th Cir. 2001) (affirming district court order prohibiting defendants "from refusing [the plaintiff] a religious exemption from existing property restrictions *solely* on the basis of his lack of membership in the Native American race" (emphasis in original)).

Defendants conclusorily argue that "[g]iven these complex issues concerning safety and security, compounded by the safety measures that are being taken to halt the COVID-19 pandemic, which require many flexible State executive measures to lessen the huge impact on all residents of the State, no federal injunctive relief should be granted." Defs.' Mot. 15. As a threshold matter, Mr. Pevia initiated this lawsuit before the COVID-19 pandemic necessitated the implementation

24

of health and safety measures at Maryland prisons, including suspending all congregate worship services. Mr. Pevia is not requesting that the Court order Defendants to provide him access to sweat lodge ceremonies in the midst of the COVID-19 pandemic. Pevia Decl. ¶ 12. Rather, Mr. Pevia seeks access to a minimum of three sweat lodge ceremonies per year as permitted under the DPSCS Religious Services Manual. OPS.140.0002.09(G)(5), Ex. 4 at 44; OPS.140.0002 app. 4, Ex. 4 at 108–09. Therefore, any injunctive relief this Court may enter would only require Defendants to follow existing DPSCS regulations governing sweat lodge ceremonies, which are in place to ensure that Mr. Pevia's right to the free exercise of his Native American faith are protected. *See Hall v. Stouffer*, No. GLR-15-1008, 2018 WL 8335491, at *17 n.18 (D. Md. Sept. 25, 2018) (rejecting the defendant's argument that the plaintiff was not entitled to injunctive relief under the PLRA and noting that "[i]f the Court were to order permanent injunctive relief, . . . it could merely order [the defendant] to follow the policies and procedures that are already in place to ensure prisoners' constitutional right of access to the courts is not violated"). Alternatively, the Court could order the Parties to meet, confer, and adopt a narrowly tailored sweat lodge policy, and if the Parties cannot agree on a policy, have each Party submit proposed policies to the Court to fashion an appropriate order. *See Native Am. Council of Tribes*, 750 F.3d, at 752. In short, Mr. Pevia is confident that the Court can fashion appropriate injunctive relief that comports with the PLRA's requirements. *See Hall*, 2018 WL 8335491, at *17 n.18 ("[T]he Court is confident that it can fashion injunctive relief that 'extend[s] no further than necessary' to correct the purported violation as required by the Prison Litigation Reform Act.").

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment should be denied.

DATED: May 14, 2021                           Respectfully submitted,

                                              /s/ Monica R. Basche
                                              Monica R. Basche
                                              Federal Bar No. 20476
                                              Jean M. Zachariasiewicz
                                              Federal Bar No. 19734
                                              Brown, Goldstein & Levy, LLP
                                              120 East Baltimore Street, Suite 2500
                                              Baltimore, MD 21202
                                              T: (410) 962-1030
                                              F: (410) 385-0869
                                              mbasche@browngold.com
                                              jmz@browngold.com

                                              *Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 14th day of May, 2021, a copy of the foregoing Plaintiff Donald R. Pevia's Opposition to Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment was served on all counsel of record via the Court's electronic filing system.

     /s/                               
Monica R. Basche
