**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **DONALD R. PEVIA,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Civil Action No. DLB-19-327** |
| **STEPHEN T. MOYER,** *et al.,* | * | |
| **Defendants.** | * | |

**MEMORANDUM OPINION**

Prison officials at maximum-security state prison North Branch Correctional Institution ("NBCI") denied the request of maximum-security state prisoner Donald R. Pevia, a member of the Native American Faith Group ("NAFG"), to participate in an NAFG sweat lodge ceremony, which Pevia claims his religious beliefs require him to attend.  Pevia, proceeding *pro se*, filed suit against numerous state and NBCI prison officials under 42 U.S.C. § 1983 and the Religious Land Use and Institutional Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc *et seq.*  He alleges that the state and prison officials are violating his free exercise right under the First Amendment by denying him access to a sweat lodge and that he is entitled to damages for the violation under § 1983.  He also alleges the Maryland Department of Public Safety and Correctional Services ("DPSCS") policy categorically prohibiting maximum-security inmates like him from participating in sweat lodge ceremonies violates RLUIPA, under which he seeks declaratory and injunctive relief.

Since Pevia filed his complaint on February 1, 2019, this case has taken several turns.  The Court previously granted summary judgment to four defendants, leaving a § 1983 claim against former DPSCS Secretary Stephen T. Moyer, former Commissioner of Correction Wayne Hill, NBCI Warden Bishop, and NBCI Assistant Warden Nines in their individual capacities, and an

RLUIPA claim against them in their official capacities. *Pevia v. Hogan*, 443 F. Supp. 3d 612, 630 (D. Md. 2020). The Court appointed Pevia counsel, and the parties engaged in discovery. After the close of discovery, defendants filed a motion to dismiss or, in the alternative, motion for summary judgment on Pevia's claims. ECF 56 & 56-1 (supporting memorandum). Plaintiff filed an opposition. ECF 61. Defendants filed a reply, and plaintiff filed two surreplies. ECF 64, 65-1, 67.[1]

In January 2022, while the motion was pending, it came to the Court's attention that DPSCS recently had transferred Pevia from NBCI to Jessup Correctional Institution ("JCI"). In light of this transfer and the parties' focus on the facts specific to Pevia's access to a sweat lodge at NBCI, the Court ordered the parties to state their positions as to whether plaintiff's transfer mooted his claim for injunctive and declaratory relief under RLUIPA. ECF 72. After reviewing the parties' positions, ECF 73, the Court held a conference call with counsel on February 10, 2022. During the call, the Court held that the prison transfer did not moot the RLUIPA claim because, even though Pevia had been transferred from one prison to another, he still was classified as a maximum-security inmate and still was subjected to the same statewide policy he challenged that categorically prohibited maximum-security inmates from participating in sweat lodge ceremonies.

On February 21, 2022, DPSCS rescinded the challenged policy. ECF 83-3; ECF 85-1, at 1. The categorical ban on maximum-security inmate participation in sweat lodge ceremonies has been replaced with a policy that states prison officials "may prohibit on a case by case basis, an offender's participation in a congregate service if the offender demonstrates or is known to

---

[1] Pevia, through counsel, filed a motion for leave to file a surreply along with his proposed surreply, which defendants did not oppose. ECF 65 & 65-1. His motion is granted, and his surreply is accepted as filed. Pevia also filed a second surreply without assistance of counsel and without seeking leave of Court. ECF 67. The Court has considered his second surreply as well.

demonstrate dangerous, violent, or other characteristics that pose a serious threat to life, property, self, staff, other offenders, or facility security." ECF 83-3, at 3. DPSCS Director of Policy and Regulations Elizabeth Bartholomew explained the policy change and the new policy in a declaration submitted to the Court:

> Effective February 21, 2022, DPSCS no longer prohibits access to Native American religious sweat lodge ceremonies solely on the grounds of an inmate's security classification. The policy to exclude maximum-security inmates from sweat lodge ceremonies that appears in the March 20, 2017, edition of OPS.140.0002—DPSCS Religious Services Manual, has been rescinded and replaced with a policy change notice, OPS.140.0002- Religious Services Manual Change Notice # 2022-01.

> Under Change Notice # 2022-01, correctional administrators are permitted to restrict the access of offenders to participate in congregate worship services only if there is a safety or security reason to do so. Specifically, inmates placed in special confinement housing (e.g., administrative or disciplinary segregation, protective custody, quarantine, or other documented reasons) are not permitted to participate in congregate activities with inmates in general population. OPS.140.0002 §.07(8)(a). See attached. Furthermore, an inmate's assessed security classification as maximum security does not preclude the inmate's being assigned to general population housing within a maximum-security facility and, therefore, able to participate in a congregate service with other general population inmates.

ECF 83-3, ¶¶ 3–4. In light of the policy rescission, the parties were asked to advise the Court whether the RLUIPA claim was now moot or whether it remained a live claim under the voluntary cessation exception to the mootness doctrine. ECF 82.

Defendants argue the RLUIPA claim is mooted by the policy recission and that the voluntary cessation exception does not apply. In support of this position, they submitted a second declaration from Director Bartholomew in which she stated:

> A Change Notice is considered a permanent change to a Directive or Manual and must be incorporated into any new published version, unless there is a lawful reason not to incorporate the changes. DPSCS directives and manuals do not change until there is a specific programmatic or lawful reason to change them.

ECF 85-1, ¶ 4.

On February 25, 2022, the Court held a conference call with the parties to discuss whether the RLUIPA claim was now moot because the challenged policy has been rescinded. Referencing Director Bartholomew's second declaration, *id.*, the defendants argued that the policy recission was permanent and therefore satisfied defendants' burden to prove mootness. The Court expressed skepticism that the declaration sufficiently satisfied the defendants' heavy burden. Defendants asked for additional time to consider their next steps, which the Court granted. ECF 87. In their subsequent filing, defendants reiterated their prior position that the rescission is a "permanent change[]" and that "Plaintiff's request for injunctive relief on the now-rescinded policy should be denied as moot." ECF 89, at 1–2. In response, plaintiff argued that defendants continued to fail to satisfy their burden to prove mootness. ECF 90, at 3. During a March 16, 2022 call with counsel, the defendants again insisted the policy change was permanent but refused to state that the rescinded policy was unlawful or that it could not, at some point, be reinstated.

Defendants' motion to dismiss or for summary judgment is ripe for resolution. No additional hearings are necessary.

## I.    Background

Pevia is a frequent litigator in this Court. He has been incarcerated since 2011 and has filed more than 30 lawsuits regarding alleged violations of his civil rights during his incarceration, including his right to practice his faith. *E.g.*, ELH-18-3902; ELH-18-3900; ELH-18-2395; ELH-18-2176; ELH-17-2796; ELH-17-273; ELH-17-10; ELH-16-3810; ELH-16-1223; ELH-14-2928; *see also* Fed. R. Evid. 201(b)(2) (court may take judicial notice of filings in other cases as matters of public record).

One such lawsuit, marginally relevant to the pending lawsuit, involved a claim that the former warden of NBCI violated Pevia's First Amendment right to exercise his religion by denying

his request to attend NAFG religious services.  *See* ECF 1 in *Pevia v. Shearin*, ELH-14-631.  That lawsuit was settled.  "[A]s a result of the settlement, NBCI officials began permitting [Pevia] to attend NAFG congregate worship services."  ECF 66-1, ¶ 3 (Pevia Decl.).  In exchange for access to services, Pevia "release[d] and discharge[d] the Defendant and the DPSCS and its officers . . . employees . . . from any and all claims and demands of whatever nature, actions and causes of action, damages, costs, expenses and compensation . . . in connection with any acts or omissions set forth in th[at] Lawsuit."  ECF 61-19, ¶ 2 (Sett. Agr.).  He did not "waive any claim or cause of action . . . against Defendant, DPSCS and/or the State . . . that d[id] not arise out of the facts giving rise to the causes of action in th[at] Lawsuit."  *Id.*

The present lawsuit—filed two and a half years after Pevia obtained permission to attend NAFG religious services—concerns the prison's denial of his subsequent request to attend a specific NAFG service:  a sweat lodge ceremony.  A "sweat lodge" is "a Native American ritual that utilize[s] hot coals within an inipi (a dome-shaped, wood constructed enclosure)." OPS.140.0002.03(34), ECF 56-5, at 9 (DPSCS Religious Services Manual ("Religious Services Manual" or "Manual")); ECF 61, at 2 (quoting Religious Services Manual).  These "religious ceremonies [are] held for the purpose of prayer and physical, mental, and spiritual purification of the participant."  OPS.140.0002.05(G)(1), ECF 56-3, at 20.  Pevia, an NAFG member, states his faith "mandate[s]" and "require[s]" his participation in a sweat lodge ceremony.  ECF 1, at 5.

Maryland prisons allow certain prisoners to participate in sweat lodge ceremonies under certain circumstances.  The DPSCS Religious Services Manual states that a "Sweat Lodge ceremony shall be available to the general population whose Religious Preference is Native American, providing resources and adequate circumstances permit, and only as a form of congregate worship."  Manual, OPS.140.0002.09(G)(2), ECF 56-5, at 44.  When circumstances

permit, prisons are required to offer at least three sweat lodge ceremonies per year. *Id.* at OPS.140.0002.09(G)(5), ECF 56-5, at 44. Prisoners may submit requests for additional sweat lodge ceremonies to the prison Chaplain. *Id.* at OPS.140.0002.09(G)(6), ECF 56-5, at 44. The Chaplain will grant the request "if resources and adequate circumstances permit and the offender [is] not a threat to safety or security." *Id.* The prison may "[s]uspend[], cancel[], postpone[] or limit[] participation" in religious services, including sweat lodge ceremonies, due to "concerns for facility safety and security" and "inappropriate conduct." *Id.* at OPS.140.0002.12B(1) & (4), ECF 56-5, at 51.

When Pevia filed his complaint, maximum-security inmates were ineligible for participation in sweat lodge ceremonies. *Id.* at OPS.140.0002.09(G)(7), ECF 56-5, at 44. The Manual stated: "Sweat Lodge ceremonies are generally open to offenders in general housing, [but] they are not open to offenders on special confinement housing units. Security staff may restrict the access of offenders in general housing or treatment units if there is a compelling security reason to do so." *Id.* In an appendix to the Manual, the restriction on sweat lodge access was specifically extended to maximum-security inmates. It stated that sweat lodges were "[a]vailable to general population, *with exception of maximum security*, disciplinary & administrative segregation, special housing units and protective custody inmates." *Id.* at OPS.140.0002 App'x 4, ECF 56-5, at 109 (emphasis added). This policy categorically banning maximum-security inmates' access to sweat lodges was rescinded effective February 21, 2022. *See* ECF 85-1, ¶ 3.

Since October 2016, Pevia has been classified as a maximum-security inmate. ECF 61-2 (Feb. 1, 2019 Release of Information Form stating that plaintiff has been designated as maximum security from October 2016 to present). Since 2016, he has been transferred multiple times—from NBCI to Western Correctional Institution ("WCI"), back to NBCI, and then to JCI. *See* ECF 66-

1, ¶¶ 5–7.  During his brief time at WCI, he was permitted to participate in a sweat lodge ceremony even though he was classified as a maximum-security inmate.  ECF 66-1, ¶ 6.  When he was transferred back to NBCI, he was denied access to a sweat lodge.  Because of this denial, Pevia filed an Administrative Remedy Procedure form ("ARP"), claiming the prison was denying his "First Amendment Right to participate in [a] Sweat Lodge Ceremon[y]" by "deliberately fail[ing] to provide one."  ECF 1-1, at 2 (ARP No. NBCI-986-18).  On August 22, 2018, his ARP was dismissed.  *Id.*  The dismissal stated the "sweat lodge ceremony is 'available to general population with the exception of maximum security, disciplinary and administrative segregation, special housing units, and protective custody inmates.'"  *Id.*  The stated reason for the denial was that Pevia was "a maximum security inmate and currently on disciplinary segregation" and therefore "not permitted access to a sweat lodge ceremony."  *Id.*  On September 15, 2018, Pevia appealed. *Id.* at 4.  On October 15, 2018, his appeal was dismissed because "[t]he warden fully addressed [his] complaint" and Pevia "failed to provide any additional evidence to substantiate [his] claim that staff is violating [his] First and Fourteenth Amendment [rights] by denying access to attend Sweat Lodge Ceremony."  *Id.* at 5.  On December 21, 2018, Pevia's appeal to the Inmate Grievance Office was dismissed as meritless.  *Id*. at 7.  This lawsuit followed.

## II.  Standard of Review

Defendants filed a motion to dismiss or, in the alternative, motion for summary judgment. ECF 56.  Both parties presented evidence with their briefs, and the Court has considered it. Therefore, the Court treats the pending motion as a Rule 56 motion for summary judgment.  *See* Fed. R. Civ. P. 12(d); *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998).

Summary judgment is appropriate when the moving party establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  To meet their burden, defendants must identify "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" in support of their position.  Fed. R. Civ. P. 56(c)(1)(A).  Then, "[t]o avoid summary judgment, the opposing party must set forth specific facts showing that there is a genuine issue for trial." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Plaintiff must identify more than a "scintilla of evidence" in support of his position to defeat the motion for summary judgment.  *Anderson*, 477 U.S. at 251.  The Court "should not weigh the evidence."  *Perkins*, 936 F.3d at 205 (quoting *Anderson*, 477 U.S. at 249).  However, if "a party fails to establish the existence of an element essential to that party's case" or "'the record taken as a whole could not lead a rational trier of fact to find for the non-moving party,'" then summary judgment is proper.  *Id.* (quoting *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  In ruling on a motion for summary judgment, this Court "view[s] the facts and inferences drawn from the facts in the light most favorable to . . . the nonmoving party."  *Perkins*, 936 F.3d at 205 (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958 (4th Cir. 1996)).

## III.  Discussion

### A.  Waiver

Defendants argue that Pevia's claims must be dismissed because under the settlement agreement in *Pevia v. Shearin*, ELH-14-631, Pevia waived all claims that could have been raised regarding Native American services, including access to sweat lodge ceremonies.  ECF 56-1, at

8

13–14.  Not so.  In the settlement agreement, Pevia waived "any and all claims and demands [against DPSCS and its officers and employees] of whatever nature, actions and causes of action, damages costs, expenses and compensation . . . in connection with any acts or omissions set forth *in th[at] Lawsuit*."  ECF 61-19, ¶ 2 (emphasis added).  He did not "waive any claim or cause of action . . . against Defendant, DPSCS and/or the State . . . that d[id] not arise out of the facts giving rise to the causes of action *in th[at] Lawsuit*."  *Id.* (emphasis added)*.*  In that lawsuit, he complained that defendant denied his "request to open a Native American Service."  *See* ECF 1 in *Pevia v. Shearin*, ELH-14-631.  The settlement agreement provided that, approximately every two weeks, a member of an "organization providing Native American religious services[] [would] meet with Mr. Pevia outdoors for the purpose of engaging in a Native American religious visit with a lit pipe."  ECF 61-19, ¶ 1(b).  Access to NAFG sweat lodge ceremonies was not raised or discussed in the prior lawsuit or in the settlement agreement.  Here, by contrast, Pevia claims that, even though he can attend regular NAFG congregate services, he cannot attend the less-frequently offered NAFG sweat lodge ceremonies.  ECF 1, at 5.  Thus, the facts giving rise to his cause of action here are distinct from the facts at issue in *Pevia v. Shearin*.  By entering into a settlement agreement in that case, Pevia did not waive the claims asserted in this case.

### B.  Section 1983 Claim for First Amendment Violation

An individual may a bring a claim for damages against a state actor who has deprived him of his constitutional rights.  *See* 42 U.S.C. § 1983.  Pevia claims that defendants violated the free exercise clause of the First Amendment when they denied him access to an NAFG sweat lodge ceremony and that he is entitled to damages under § 1983 for the ongoing constitutional violation. ECF 1, at 5, 10.  In response, defendants assert the defense of qualified immunity.  ECF 56-1, at 8.

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally . . . are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "Proof that the official acted in objectively reasonable reliance on existing law . . . would exempt an official from liability under § 1983 . . . ."  *Melgar ex rel. Melgar v. Greene*, 593 F.3d 348, 360 (4th Cir. 2010) (citation omitted).  Qualified immunity gives officials "breathing room to make reasonable but mistaken judgments about open legal questions."  *Lane v. Franks*, 573 U.S. 228, 243 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).  The doctrine "protect[s] 'all but the plainly incompetent or those who knowingly violate the law.'"  *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

When deciding whether the doctrine of qualified immunity applies, the Court considers (1) "'whether the facts that a plaintiff has . . . shown . . . make out a violation of a constitutional right'" and (2) "whether the right at issue was 'clearly established' at the time of [the] alleged misconduct."  *Pearson v. Callahan,* 555 U.S. 223, 232 (2009) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds as stated in Pearson*); *Hicks v. Ferreyra*, 965 F.3d 302, 307 (4th Cir. 2020).  The plaintiff bears the burden of proving that a constitutional violation occurred, and the defendant bears the burden of proving that the constitutional right allegedly violated was not clearly established.  *See Meyers v. Baltimore Cnty., Md.*, 713 F.3d 723, 731 (4th Cir. 2013); *Henry v. Purnell*, 501 F.3d 374, 377–78 (4th Cir. 2007).  Courts have "discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in [a] particular case . . . ."  *Pearson*, 555 U.S. at 236.  In an exercise of

this discretion, the Court considers only the second prong of the qualified immunity analysis: whether the constitutional right was clearly established at the time of the alleged misconduct.

A right is "clearly established" if "it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted." *Raub v. Campbell*, 785 F.3d 876, 882 (4th Cir. 2015). The Court must "consider whether a right is clearly established 'in light of the specific context of the case, not as a broad general proposition.'" *Adams v. Ferguson*, 884 F.3d 219, 227 (4th Cir. 2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam)). To determine whether a right was clearly established, the Court considers whether "existing precedent . . . placed the statutory or constitutional question beyond debate," making it "sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quoting *al-Kidd*, 563 U.S. at 741). The Court "ordinarily need not look beyond the decisions of the Supreme Court, [the Fourth Circuit], and the highest court of the state in which the case arose" that were available when the challenged conduct occurred. *Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs.*, 597 F.3d 163, 176 (4th Cir. 2010) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999)). But the Court may consider "any number of sources, including a criminal case, a statute, or the Constitution itself." *Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379, 399 (4th Cir. 2014).

The First Amendment protects individuals from the imposition of any federal "law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I; *see O'Lone v. Est. of Shabazz*, 482 U.S. 342, 348 (1987). Individuals who are incarcerated retain this right, as "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Heyer v. U.S. Bureau of Prisons*, 984 F.3d 347, 355 (4th Cir. 2021) (quoting *Turner v. Safley*, 482 U.S. 78, 84 (1987)). Yet "[l]awful incarceration brings

11

about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *O'Lone*, 482 U.S. at 348 (quoting *Price v. Johnston*, 334 U.S. 266, 285 (1948)).  Thus, an inmate's First Amendment rights are limited to those "that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Heyer*, 984 F.3d at 355 (quoting *Pell v. Procunier*, 417 U.S. 817, 822 (1974)).

Pevia argued at the administrative level that defendants violated his "First Amendment Right to participate in [a] Sweat Lodge Ceremon[y]," ECF 1-1, at 2, but he now claims the constitutional right that was violated is the broader First Amendment right to free exercise of religion, ECF 61, at 21.  Defendants urge the Court to define the purported right more narrowly as "the right for prisoners to have access to a Sweat Lodge."  ECF 56-1, at 8.

In other cases involving challenges to prison policies on sweat lodge access, courts have defined the constitutional right as the right to access a sweat lodge under the specific circumstances of the case.  For example, in *Youngbear v. Thalacker*, the court granted qualified immunity after considering

> whether a reasonable corrections official would have known as of September of 1998 and thereafter that it violated the Free Exercise Clause to delay for twelve months providing a sweat lodge to Native American inmates who are practicing members of the Native American religion because of problems with consultants the Iowa Department of Corrections contracted with to provide direction regarding the Native American religion.

174 F. Supp. 2d 902, 919–20 (N.D. Iowa 2001).  More recently, in *Buckles v. Crowe*, the court considered the plaintiff's alleged "right to have a sweat lodge constructed for him at [the prison where he was housed] or to be transported to a facility that had a sweat lodge."  No. 18-84-BLG-SPW-TJC, 2021 WL 1341887, at *6 (D. Mont. Feb. 22, 2021), *report and recommendation adopted*, No. 18-84-SPW-TJC, 2021 WL 1171672 (D. Mont. Mar. 29, 2021).  In *Sisney v. Reisch*,

674 F.3d 839, 845 (8th Cir. 2012), the plaintiff asked the Eighth Circuit to consider "whether the free exercise of religion within a penal setting is a clearly established right," as it had done in *Thomas v. Gunter (Thomas I)*, 32 F.3d 1258, 1261 (8th Cir. 1994). The Eighth Circuit observed that "the key issue considered, in *Thomas I*" was not the broad issue Sisney identified but rather "the fact-bound question of whether there was 'a rational relationship . . . between legitimate penological interests and the denial of even brief access to the sweat lodge[.]'" *Sisney*, 674 F.3d at 845 (quoting *Thomas I*, 32 F.3d at 1261, and noting that, in the subsequent history of *Thomas I*, the Eighth Circuit considered the narrowly defined right to "daily and extended access on weekday afternoons to [a] sweat lodge" (quoting *Thomas v. Gunter (Thomas II),* 103 F.3d 700, 703 (8th Cir. 1997)). *See also Pasaye v. Nevada*, No. 217CV02574JADVCF, 2020 WL 2105024, at *5 (D. Nev. May 1, 2020) (defining right as the right of an inmate without "Native American heritage" to "participat[e] in Native American religious practices"); *Farrow v. Stanley*, No. 02-567-PB, 2005 WL 2671541, at *13 (D.N.H. Oct. 20, 2005) (defining right as "a prisoner's right to make use of a sweat lodge").

In the specific context of this case, the constitutional right at issue is the right of a maximum-security inmate to participate in an NAFG sweat lodge ceremony. Having established the scope of the right, the Court must determine whether that right was clearly established such that the defendants could have known that their conduct violated Pevia's constitutional rights. *See Lane v. Griffin*, 834 F.2d 403, 408 (4th Cir. 1987).[2]

---

[2] As a general proposition, Pevia's right to practice his religion is undisputed. It is beyond cavil that the free exercise clause "forbids the adoption of laws designed to suppress religious beliefs or practices." *Wall v. Wade*, 741 F.3d 492, 498 (4th Cir. 2014) (quoting *Morrison v. Garraghty*, 239 F.3d 648, 656 (4th Cir. 2001)); *see also Von Poole v. NBCI*, No. GLR-17-1594, 2019 WL 4805681, at *18 (D. Md. Sept. 30, 2019) (quoting *Wall*). Defendants previously conceded that plaintiff has a "clearly established right to exercise his faith." ECF 10-1; *see also* ECF 61, at 21 (asserting "the First Amendment free exercise of religion is a clearly established right"). While Judge Hollander

When defendants denied Pevia's request to participate in a sweat lodge ceremony in the latter half of 2018, there was no Supreme Court or Fourth Circuit decision guaranteeing a maximum-security prisoner the right to participate in a sweat lodge ceremony.  And there still is none today.  The Court has identified out-of-circuit decisions on a prisoner's access to a sweat lodge ceremony, but none has held that a prisoner, regardless of classification, has a constitutional right to participate in the ceremony.  Other courts, too, have found no caselaw clearly establishing the right.  *See, e.g.*, *Buckles*, 2021 WL 1341887, at *5 ("A survey of other cases around the country on this issue . . . fails to establish a clear line of authority establishing . . . a right [to access a sweat lodge in prison]."); *Cryer v. Clarke*, No. 09-10238-PBS, 2012 WL 6800791, at *13 (D. Mass. Sept. 7, 2012) ("Cryer has not identified clearly established law conferring a constitutional right to access a sweat lodge."); *Farrow v. Stanley*, No. 02-567-PB, 2005 WL 2671541, at *13 (D.N.H. Oct. 20, 2005) ("The case law is sufficiently unsettled for me to conclude that there is no consensus of authority as to a prisoner's right to make use of a sweat lodge.  Therefore, the right is not clearly established . . . .").

Not only was there no caselaw clearly establishing a prisoner's right to access a sweat lodge, but there was ample caselaw at the time of the denial supporting a prison's ability to curtail a prisoner's free exercise right, including sweat lodge access, based on safety concerns and the prisoner's security status.  *E.g.*, *Hamilton v. Schriro*, 74 F.3d 1545, 1551 (8th Cir. 1996) ("Our prior decisions make it clear that . . . prohibiting sweat lodge ceremonies do[es] not violate an inmate's constitutional right to free exercise of religion" because the "denial of [plaintiff's] access

---

concluded earlier in this litigation that "Plaintiff's constitutional right was well established at the relevant time," *Pevia v. Hogan*, 443 F. Supp. 3d 612, 640 (D. Md. 2020), the Court referred only to Pevia's right to exercise his religion in general without defining its contours or addressing whether he had a right to access a sweat lodge under the facts of the case.

to a sweat lodge was rationally related to the legitimate penological interests of safety and security at [the prison]."); *Allen v. Toombs*, 827 F.2d 563, 567 (9th Cir. 1987) (affirming summary judgment where denial of "access to the Sweat Lodge ceremony [was] reasonably related to the defendants' legitimate concern for prison security"); *Neff v. Steven*, No. RDB-14-718, 2014 WL 5140343, at *1 (D. Md. Oct. 10, 2014) (observing in dicta that "[o]nce an inmate is assigned to administrative or disciplinary segregation, . . . he forfeits the right to attend congregate worship services"), *aff'd*, 621 F. App'x 732 (4th Cir. 2015).  In fact, in one of Pevia's prior lawsuits in which he alleged a violation of his First Amendment free exercise right, this Court granted summary judgment in favor of the prison defendants "[b]ecause the restrictions placed on plaintiff during this time were related to legitimate penological purposes regarding the safety of the institution."  *Pevia v. Bishop*, No. ELH-17-2798, 2018 WL 3956619, at *6 (D. Md. Aug. 16, 2018).

Considering the lack of any precedent holding a prisoner has a right to access a sweat lodge and the then-existing precedent on the curtailment of prisoners' religious freedoms for security reasons, the Court finds that a reasonable prison official could not have known that denying Pevia, a maximum-security inmate, access to a sweat lodge ceremony was a violation of his First Amendment right to the free exercise of his religion.  *See Lane*, 834 F.2d at 408.  Accordingly, defendants have proven, as a matter of law, that they did not violate a clearly established constitutional right.  *See id.*; *see also Mullenix*, 577 U.S. at 12; *Adams*, 884 F.3d at 227.  They are entitled to qualified immunity.  Summary judgment on Pevia's § 1983 claim is entered in defendants' favor.[3]

---

[3] Alternatively, defendants argue that the § 1983 claim against defendants Hill and Moyer cannot survive summary judgment because they were "not involved in the decision about the Sweat Lodge."  ECF 56-1, at 14.  Pevia concedes that the § 1983 claim against Moyer should be dismissed but contends that the claim against Hill should survive because "he signed Mr. Pevia's ARP appeal, reflecting his receipt of the document and his decision to dismiss it."  ECF 61, at 28 & n.13.

### C.  RLUIPA Claim

Defendants have moved for judgment as a matter of law on Pevia's RLUIPA claim.  ECF 56, at 1.  The parties' briefing focused heavily on the facts specific to Pevia's access to a sweat lodge at NBCI, suggesting Pevia asserted a challenge to the statewide DPSCS policy as applied to him.  But it is clear Pevia pled a facial challenge to the policy.  This distinction is especially important here because even though Pevia was transferred from NBCI to another institution after summary judgment briefing, the challenged policy continues to apply to him and others so long as they are detained in a state prison and classified as maximum-security inmates.

A facial challenge is "an attack on a statute [or policy] itself as opposed to a particular application."  *City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015).  Whether a plaintiff asserts a facial challenge or an as-applied challenge "informs only the choice of remedy and not what must be alleged in the complaint."  *People for the Ethical Treatment of Animals, Inc. v. Stein* (*PETA*), 466 F. Supp. 3d 547, 579 (M.D.N.C. 2020) (citing *Citizens United v. Fed. Election*

---

Defendants insist that Hill's signature on the ARP does not give rise to § 1983 liability.  ECF 64, at 13.  The doctrine of respondeat superior does not apply to § 1983 claims, and therefore an official will be found liable only if the plaintiff shows the official "acted personally in the deprivation of the plaintiff['s] rights."  *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (quoting *Bennett v. Gravelle*, 323 F. Supp. 203, 214 (D. Md.), *aff'd*, 451 F.2d 1011 (4th Cir. 1971)); *see also Fuller v. Corizon, Inc.*, No. PWG-19-1705, 2020 WL 607011, at *13 (D. Md. Feb. 7, 2020) ("[T]he mere receipt and processing of an ARP, without more, is insufficient to impose liability.").  Although Hill signed the dismissal of Pevia's ARP appeal, there is no evidence that Hill was personally involved in the initial decision to deny him access to a sweat lodge. Consequently, Pevia has not established a basis for liability as to Hill.  *See Vinnedge*, 550 F.2d at 928; *Fuller*, 2020 WL 607011, at *13.  Therefore, Hill, like Moyer, is entitled to summary judgment in his favor for that additional reason.

*Comm'n*, 558 U.S. 310, 331 (2010)).  RLUIPA allows facial challenges to prison policies.[4]  *See, e.g.*, *Lovelace v. Lee*, 472 F.3d 174, 193 (4th Cir. 2006) (concluding plaintiff's "claim that the policy as issued violate[d] RLUIPA" survived summary judgment); *see also Snodgrass v. Robinson*, No. 7:14CV00269, 2015 WL 4743986, at *7 (W.D. Va. Aug. 10, 2015) ("[Prisoner] alleges that this policy—*as written and as applied*—'hindered' his ability to fast during Ramadan because it made him ineligible for pre-sunrise and post-sunset meal service.") (emphasis added); *Hodgson v. Fabian*, No. 08-5120 JNESRN, 2009 WL 2972862, at *11 n.6 (D. Minn. Sept. 10, 2009) (acknowledging the plaintiff asserted a facial challenge under RLUIPA to the prison policy), *aff'd*, 378 F. App'x 592 (8th Cir. 2010).

In his complaint, Pevia alleges:

> Since at least 2015, Native American Prayer Sweat Lodges ha[ve] been approved for prayer.

> November 3, 2017, I was transferred to WESTERN CORRECTIONAL INSTITUTION (WCI).  While housed there, I freely participated in my first sweat lodge ceremony on December 21, 2017 for the Winter Solstice.

> Without reason nor justification, I was transferred back to NBCI on January 21, 2018.  Upon arrival and participation in the Hoop, Inmate Norman Moyes and Mark French explained that NBCI was in progress of building a sweat lodge.  After numerous months with no progress, I filed my grievance.

> Maximum security is not permitted access to the sweat lodge even though it poses no additional security threat nor serves a penological interest in denying me a mandated and required prayer worship that[']s approved.

---

[4] Facial challenges under RLUIPA often arise in the context of land use regulations.  *See Canaan Christian Church v. Montgomery Cnty., Md.*, --- F.4th ----, 2022 WL 839954, at *13 (4th Cir. 2022) (Richardson, J., concurring) ("[T]here are at least two ways to bring an Equal Terms claim under RLUIPA, through a facial challenge or through an as-applied challenge . . . ."); *see also, e.g.*, *Hunt Valley Baptist Church, Inc. v. Baltimore Cnty., Md.*, No. ELH-17-804, 2017 WL 4801542, at *31 (D. Md. Oct. 24, 2017) (holding facial challenge to zoning ordinance under RLUIPA survived motion to dismiss); *Redemption Cmty. Church v. City of Laurel, Md.*, 333 F. Supp. 3d 521, 530 (D. Md. 2018) (finding facial challenges to land use regulations brought under RLUIPA ripe for decision); *Moore-King v. Cnty. of Chesterfield, Va.*, 819 F. Supp. 2d 604, 614 (E.D. Va. 2011) (addressing four facial challenges to land use policies under RLUIPA).

Being denied access to the sweat lodge not only violates my First Amendment [right] of practicing my religious right but also violates my Fourteenth Amendment under the equal access clause.

Defendants allege that even though the sweat lodge is an approved religious practice for the D.P.S.C.S., it is only approved for medium security and under. Religious worship is not a privilige [sic] but a Federal protected Constitutional right.

Denying me access to an approved worship service solely on my security level and permit another prison of the same security level violates the Due Process of Equal Access.

Therefore, violating my Constitutional Rights.

ECF 1, at 5–6.  In his prayer for relief, Pevia requests "a declaration that acts and omissions described [in his complaint] violated plaintiff[']s rights under the Constitution and laws of the United States" and a "preliminary and permanent injunction ordering defendants . . . to Permit[] access of prayer sweat lodges . . . ."  *Id.* at 10.  His claims challenge the policy itself, rather than its application to him.  Indeed, they must; because the policy is a categorical rule, there is no way to isolate or distinguish Pevia from other maximum-security inmates affected by the policy.  For the same reason, the remedies he seeks—declaratory judgment and an injunction—would benefit him and other NAFG maximum-security inmates in the custody of DPSCS.  In other words, Pevia "seeks to vindicate not only his own rights, but those of others who may also be adversely impacted by the [policy] in question."  *City of Chicago*, 527 U.S. at 55 n.22.  Therefore, Pevia brings a facial challenge to the statewide policy denying all maximum-security inmates access to a sweat lodge.  *See City of Los Angeles*, 576 U.S. at 415.

   *1.  Mootness*

Before considering whether defendants are entitled to summary judgment on Pevia's RLUIPA claim, the Court first considers whether the claim is moot because the challenged policy has been rescinded.  When Pevia filed his complaint in 2019, he challenged the existing DPSCS

policy categorically prohibiting maximum-security inmates from sweat lodge ceremonies.  That policy recently was rescinded.  Under the new policy, maximum-security inmates like Pevia are no longer categorically ineligible for sweat lodge ceremonies.  Now, prison officials "may prohibit on a case by case basis, an offender's participation in a congregate service if the offender demonstrates or is known to demonstrate dangerous, violent, or other characteristics that pose a serious threat to life, property, self, staff, other offenders, or facility security."  ECF 83-3, at 3.  "DPSCS no longer prohibits access to Native American religious sweat lodge ceremonies solely on the grounds of an inmate's security classification."  *Id*. at 1.  "The policy to exclude maximum-security inmates from sweat lodge ceremonies that appears in the March 20, 2017, edition of OPS.140.0002—DPSCS Religious Services Manual, has been rescinded . . . ."  *Id*.  Defendants argue the policy change renders Pevia's RLUIPA claim moot.  Pevia insists an actual controversy remains because defendants have not met their burden of proving mootness.

A claim is moot "[w]hen a . . . controversy ceases to exist—either due to a change in the facts or the law."  *Porter v. Clarke*, 852 F.3d 358, 363 (4th Cir. 2017).  Mootness means the plaintiff no longer has the legally recognized "personal interest" required for standing, and as a result, the Court no longer has subject matter jurisdiction.  *Id.* (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997)); *see Powell v. McCormack*, 395 U.S. 486, 496 (1969); *S.C. Coastal Conservation League v. U.S. Army Corps of Eng'rs*, 789 F.3d 475, 482 (4th Cir. 2015).

There are exceptions to mootness.  Under the voluntary cessation exception, "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice," and the claim is not moot even though the challenged conduct has terminated.  *Porter*, 852 F.3d at 363 (quoting *City of Mesquite v. Aladdin's Castle,*

*Inc.*, 455 U.S. 283, 289 (1989)); *see also United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953). This exception "seeks to prevent 'a manipulative litigant [from] immunizing itself from suit indefinitely, altering its behavior long enough to secure a dismissal and then reinstating it immediately after.'" *Porter*, 852 F.3d at 364 (quoting *ALCU of Mass. v. U.S. Conf. of Catholic Bishops*, 705 F.3d 44, 54–55 (1st Cir. 2013)). Although a defendant may assert mootness based on its voluntary cessation of challenged conduct, the defendant "bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 190 (2000)). "In the context of conditions of confinement cases, in particular, courts have found that a change that 'completely and *irrevocably* eradicate[s] the effects' of the condition or policy subject to challenge renders an action moot." *Id.* (quoting *Lindquist v. Idaho State Bd. of Corr.*, 776 F.2d 851, 854 (9th Cir. 1985) (emphasis added). But "a defendant fails to meet its heavy burden . . . when the defendant retains the authority and capacity to repeat an alleged harm." *Id.* (citing *Wall v. Wade*, 741 F.3d 492, 497 (4th Cir. 2014)). Thus, for a claim to be moot after a defendant voluntarily ceases a challenged practice, it must be clear that the defendant considers itself barred from reinstating the rescinded policy. *See Porter*, 852 F.3d at 365 (finding the voluntary cessation exception applied when "nothing bar[red] the Corrections Department from reverting to the challenged policies in the future"); *see also Wall*, 741 F.3d at 497 (finding the voluntary cessation exception applied when nothing suggested the defendant was barred or considered itself barred from reinstating the challenged policy).

In *Porter*, death row inmates sued prison officials and argued that their conditions of confinement (confined alone approximately 23 hours per day with limits on visitation and no access to programs, group religious services, the gymnasium, or the prison yard) violated the

Eighth Amendment.  852 F.3d at 360.  In response, prison officials "substantially changed the policies governing the conditions of confinement for inmates on Virginia's death row, addressing virtually all of the issues raised in Plaintiffs' complaint."  *Id*.  The district court dismissed the plaintiffs' claim as moot.  *Id*.  The Fourth Circuit reversed and remanded because the defendants failed to satisfy their burden to overcome the voluntary cessation exception to mootness.  Specifically, the defendants "refused to commit to keep the revised policies in place and not revert to the challenged practices."  *Id*. at 365.  And, not only did "nothing bar[] the Corrections Department from reverting to the challenged policies in the future," but the operating procedures actually required a review of the policy within three years, such that "it [was] more than a 'mere possibility' that Defendants [would] alter Plaintiffs' current conditions of confinement."  *Id*. (quoting *W.T. Grant*, 345 U.S. at 633).  The Fourth Circuit held that the prison's policy change alone, when the defendants had the authority to undo it and refused to pledge not to return to the prior policy, was insufficient to satisfy the defendants' burden.

In *Wall*, an inmate challenged a prison policy that made inmates ineligible for participation in Ramadan activities unless they "provide[d] some physical indicia of Islamic faith, such as a Quran, Kufi, prayer rug, or written religious material obtained from the prison Chaplain's office" to prove the sincerity of their religious beliefs.  741 F.3d at 494.  Plaintiff—who did not have such articles of faith because, according to him, the prison had lost his possessions—alleged that the policy violated RLUIPA.  *Id*. at 495.  The prison then changed the policy to allow inmates to "demonstrate sincerity by showing that they have in the past borrowed religious material such as DVDs, CDs, or literature from the Chaplain's office."  *Id*. at 496.  The Fourth Circuit concluded that the policy change did not moot the plaintiff's RLUIPA claim because "[n]othing in the memo [describing the policy change] suggest[ed] that VDOC [was] actually barred—or even

consider[ed] itself barred—from reinstating the 2010 Ramadan policy should it so choose." *Id.* at 497. The Court held that "bald assertions of a defendant—whether governmental or private—that it will not resume a challenged policy fail to satisfy any burden of showing that a claim is moot." *Id.* at 498.

Here, defendants submitted in support of their mootness argument two declarations by DPSCS Director of Policy and Regulations Elizabeth Bartholomew regarding the rescinded policy and the purportedly permanent policy change. *See* ECF 83-3 & 85-1. According to her, the rescission came in the form of a "Change Notice" that eliminated the prior policy barring inmates from access to a sweat lodge based solely on their maximum-security classification. ECF 83-3, ¶ 3. As to the permanence of the Change Notice, she states:

> A Change Notice is considered a permanent change to a Directive or Manual and must be incorporated into any new published version, unless there is a lawful reason not to incorporate the changes. DPSCS directives and manuals do not change until there is a specific programmatic or lawful reason to change them.

ECF 85-1, ¶ 4. Although Director Bartholomew claims a Change Notice is "considered a permanent change," she does not state the Change Notice rescinding the challenged policy is unqualifiedly permanent or that the prior policy is irrevocably rescinded. Quite the contrary is true. DPSCS may change policies—and presumably resume rescinded policies—if "there is a specific programmatic or lawful reason to change them." *Id.* DPSCS therefore retains the authority and capacity to return to the rescinded policy if it believes there is a lawful reason to do so, and it has not stated it believes it would be unlawful to revert to the old policy. Indeed, the defendants explicitly refuse to admit the rescinded policy was unlawful.[5] Further, the defendants

---

[5] During the March 16, 2022, call, the Court asked counsel for the defendants whether DPSCS would admit the rescinded policy was unlawful. Counsel stated her client refused to make that admission.

refuse to commit not to reinstate the rescinded policy and do not consider themselves barred from reinstating it.

As additional evidence that the policy change is permanent, defendants point to the "mission statement" in the Foreword of the Religious Services Manual, which states:

> The Religious Services Manual represents a continuous effort on the part of the Department of Public Safety and Correctional Services (DPSCS), to accommodate the constitutional mandates and governmental laws affording religious rights of its incarcerated population. Offenders are afforded the opportunity to freely exercise their religious beliefs through religious programming and practices, subject to the religious[] program limits while maintaining security, safety, health and orderly operation of each correctional facility.

Foreword to Religious Services Manual, ECF 56-5, at 2.  This is the same Foreword that was in effect when the rescinded policy was in effect; it has not changed in light of the new policy.  It does not provide any assurances that defendants will not reinstate the rescinded policy.

Defendants have not satisfied their heavy burden to prove DPSCS's cessation of the challenged policy rendered Pevia's claim moot.[6]

---

[6] In addition to asserting that Pevia's RLUIPA claim is moot because DPSCS rescinded its policy, the defendants argued that Pevia's transfer to JCI mooted the claim.  ECF 73, at 1.  The Court ruled on this argument during the February 10 on-the-record call with counsel.  A prison transfer moots an inmate's claims only when the inmate is transferred "from a unit or location where he is subject to the challenged policy, practice, or condition, to a different unit or location where he is no longer subject to the challenged policy, practice, or condition." *Incumaa v. Ozmint*, 507 F.3d 281, 286 (4th Cir. 2007); *see id.* at 287 (noting that, under those circumstances, an inmate who seeks injunctive or declaratory relief "no longer has a legally cognizable interest in a judicial decision on the merits of his claim" because the inmate "is free of the policy or practice that provoked his lawsuit in the first place" and "[a]ny declaratory or injunctive relief ordered in the inmate's favor in such situations would have no practical impact on the inmate's rights and would not redress in any way the injury he originally asserted").  The four cases defendants cited for the general proposition that a prison transfer alone moots claims for injunctive and declaratory relief, ECF 73, at 2, involved allegations of prison-specific or classification-specific injuries that did not affect the inmate after a prison transfer or classification change.  *See Altizer v. Deeds*, 191 F.3d 540, 542–43 (4th Cir. 1999) (prison transfer mooted injunctive claim that warden at prior prison retaliated against inmate by ordering inspection of his outgoing mail); *Williams v. Griffin*, 952 F.2d 820, 821–22 (4th Cir. 1991) (prison transfer mooted injunctive claim based on prior prison's overcrowding, unsanitary bathrooms, plumbing issues, inadequate clothing and bedding, and inadequate insect and vermin control); *Magee v. Waters*, 810 F.2d 451, 452 (4th Cir. 1987) (prison

### 2.   *Proper Defendants for RLUIPA Claim*

Pevia asserts his RLUIPA claim against the Secretary of DPSCS, the Commissioner of Correction, NBCI Warden Bishop, and NBCI Assistant Warden Nines.  The claim against Bishop and Nines cannot stand, because they did not "issue[] the challenged policy as . . . official[s] of the [State]."  *See Lovelace v. Lee*, 472 F.3d 174, 193 (4th Cir. 2006).  In *Lovelace*, the inmate asserted facial and as-applied challenges under RLUIPA to a prison-specific policy and named as defendants the warden and assistant warden acting "in their official capacities."  *Id*.  The Fourth Circuit held the inmate had a claim only against the warden "who issued the challenged policy as an official of the Commonwealth" and not against the assistant warden who did not issue the policy.  *Id.*

Here, Pevia seeks injunctive and declaratory relief through a facial challenge to a statewide DPSCS policy for which statewide DPSCS officials are responsible.  *See* ECF 83-3, at 3 (change notice signed by DPSCS Secretary and Deputy Secretary of Operations); ECF 56-5, at 1 (Manual approved by DPSCS Deputy Secretary of Operations and authorized by Acting Chief of Religious Services); ECF 56-5, at 5 (Executive Director of Field Support Services and Director of Religious Services annually review Manual to maintain it "consistent with current DPSCS policy and procedures").  There is no evidence in the record that Warden Bishop and Assistant Warden Nines had any role in issuing the statewide DPSCS policy on prisoner access to sweat lodge ceremonies

---

transfer mooted claims relating to prior prison's "lack of adequate medical care, denial of access to the courts on account of lack of library facilities and denial of free envelopes, and failure of the jail to furnish proper security for his personal property"); *Taylor v. Rogers*, 781 F.2d 1047, 1048 n.1 (4th Cir. 1986) (classification change mooted inmate's injunctive claim that he was treated differently during his prior classification).  None of these cases states that an inmate's claim based on an injury caused by a statewide policy that applies before and after a prison transfer is mooted by a prison transfer alone.  Pevia's alleged injury—the denial of access to a sweat lodge based on his classification as a maximum-security inmate pursuant to a statewide DPSCS policy—continued from NBCI to JCI.  Therefore, Pevia's transfer to JCI did not moot his RLUIPA claim.

or that they would have any role in amending it in the future. Pevia's RLUIPA claim against Warden Bishop and Assistant Warden Nines is dismissed. The Secretary of DPSCS and the Commissioner of Correction, as officials ultimately responsible for DPSCS's statewide policies, remain proper defendants for plaintiff's RLUIPA claim.[7]

### 3. *Defendants' Motion for Summary Judgment*

The Court now considers whether defendants Secretary Green and Commissioner Harvey are entitled to judgment as a matter of law on the RLUIPA claim. The Court finds they are not.

RLUIPA offers prisoners greater protection of their free exercise rights than the First Amendment. *See Lovelace v. Lee*, 472 F.3d 174, 186 & 199–200 (4th Cir. 2006). The statute forbids the government from "impos[ing] a substantial burden" on a prisoner's religious exercise rights unless the government shows the burden advances a compelling governmental interest and "is the least restrictive means of furthering that . . . interest." 42 U.S.C. § 2000cc-1(a); *see Madison v. Riter*, 355 F.3d 310, 321 (4th Cir. 2003).

RLUIPA "claims proceed in two stages." *Wright v. Lassiter*, 921 F.3d 413, 418 (4th Cir. 2019). At stage one, "the plaintiff must show that the prison's policies imposed a substantial burden on his exercise of sincerely held religious beliefs." *Id.* A substantial burden is imposed if the policy "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Lovelace*, 472 F.3d at 187 (quoting *Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450

---

[7] Robert L. Green is now the Secretary of DPSCS and Annie D. Harvey is now the Commissioner of Correction. Secretary Green is substituted for Secretary Moyer and Commissioner Harvey is substituted for Commissioner Hill as defendants for the claims brought against them in their official capacities. Fed. R. Civ. P. 25(d). Insofar as Pevia states that Secretary Moyer "should . . . be dismissed" because he "was not personally involved in the decision not to permit sweat lodge ceremonies at NBCI," ECF 61, at 28 n.13, the Court understands the statement to pertain to the claim against Moyer in his individual capacity, not the RLUIPA claim concerning DPSCS's statewide policy, brought against the Secretary in his official capacity.

U.S. 707, 718 (1981), and noting "substantial burden" has the same meaning for purposes of the free exercise clause as for RLUIPA). The Court may define the plaintiff's free exercise right "at the broadest level of generality." *Heyer v. U.S. Bureau of Prisons*, 984 F.3d 347, 356 (4th Cir. 2021). The plaintiff need not show the government's conduct was discriminatory. *Bethel World Outreach Ministries v. Montgomery Cnty. Council*, 706 F.3d 548, 557 (4th Cir. 2013). If the first stage requirement is satisfied, the Court proceeds to stage two.

At stage two, the Court "ask[s] whether the prison's policies are justified despite the burden they impose." *Wright*, 921 F.3d at 418. The burden is on the government "to show that its policies satisfy strict scrutiny: that is, the policies must represent the least restrictive means of furthering a compelling governmental interest." *Id.* (citing 42 U.S.C. § 2000cc-1(a)). The Court must apply "a 'more searching standard' of review of free exercise burdens than the standard used in parallel constitutional claims: strict scrutiny instead of reasonableness." *Lovelace*, 472 F.3d at 186 (quoting *Madison*, 355 F.3d at 314–15 n.1). Nonetheless, courts should give "due deference to the experience and expertise of prison and jail administrators." *Id.* (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005)).[8]

There is no dispute that Pevia, a member of the NAFG, holds a sincere religious belief and that defendants denied him access to attend an NAFG sweat lodge ceremony, an "exercise [of his] sincerely held religious belief." *See Pevia v. Hogan*, 443 F. Supp. 3d 612, 638 (D. Md. 2020). As

---

[8] Defendants contend that Pevia must prove they intended to violate his rights under RLUIPA. ECF 56-1, at 11; ECF 64, at 10. For this proposition, defendants cite *Lovelace*, 472 F.3d at 194. But the *Lovelace* Court did not so hold. Rather, it held that to prove a claim under RLUIPA against a defendant in their individual capacity, the plaintiff "must further prove that they acted with the requisite intent," which is something more than "simple negligence." *Lovelace*, 472 F.3d at 194. The Court did not apply that intent requirement to official capacity claims. Here, Pevia brings his RLUIPA claim "against Defendants in their official capacity." ECF 61, at 16; *see* ECF 1, at 5. Therefore, intent is not an element of his claim. *See Lovelace*, 472 F.3d at 194.

the Court previously held, Pevia "demonstrate[s] that the prison's policy exacts a substantial burden on religious exercise . . . ." *Id.*

The Court next considers whether defendants have established, as a matter of law, that the prison's policy categorically prohibiting maximum-security inmates from participating in sweat lodge ceremonies was the least restrictive means of furthering a compelling governmental interest. *See Wright*, 921 F.3d at 418.   A compelling government interest is one "of the highest order."  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993) (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972)).  The compelling interest standard "is not 'water[ed] . . . down' but 'really means what it says.'"  *Id.* (quoting *Employment Div., Dep't of Hum. Res. v. Smith*, 494 U.S. 972, 888 (1990)).   The least restrictive means standard "is 'exceptionally demanding' and requires the government to 'sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y].'"  *Holt v. Hobbs*, 574 U.S. 352, 353 (2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014)).

Defendants claim the compelling government interest is prison security.  ECF 56-1, at 12–13; ECF 64, at 1, 9; *see Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005) ("[P]rison security is a compelling state interest . . . ."); *Dunn v. Smith*, 141 S. Ct. 725, 725 (2021) ("Prison security is, of course, a compelling state interest.") (Kagan, J., concurring).  "Context matters" in applying the compelling government interest standard under RLUIPA, and courts should afford "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources."  *Lovelace*, 472 F.3d at 189–90 (quoting *Cutter*, 544 U.S. at 722–23 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 327 (2003))).

While certain policies will, in some contexts, undoubtedly further the government's compelling interest in prison security, the Court cannot determine as a matter of law that this is such a case. Evidence in the record supports a strong inference that maximum-security inmates participated in sweat lodge ceremonies while the policy categorically banning them from doing so was in place. Pevia has offered undisputed evidence that he himself participated in a sweat lodge ceremony as a maximum-security prisoner at WCI, a maximum-security prison, in December 2017, when the policy banning such activity was in effect. ECF 61-8, ¶ 6; ECF 14-1 (Attachment A – OPS.110.0013) (facility security level designation chart indicating that, as of at least January 2015, WCI was designated a maximum level I security facility). Pevia also offers evidence that prison officials planned for sweat lodge ceremonies to begin at WCI in early 2011. ECF 61-14 (collecting emails among the Director of Religious Services, the WCI warden, assistant warden, and chaplain, and others regarding establishing a sweat lodge at WCI). Defendants, too, have offered evidence confirming WCI offered sweat lodge ceremonies while the challenged policy was in effect. ECF 10-5, ¶ 2 (Lamp Decl.); ECF 56-4, ¶ 9 (Nines Decl.). While there is no evidence that WCI houses only maximum-security prisoners and therefore only maximum-security inmates have attended sweat lodge ceremonies there, defendants have not offered any evidence to rebut the inference that at least some WCI inmates who participated in sweat lodge ceremonies were classified as maximum security. The Court must draw all reasonable inferences in favor of Pevia, and doing so leads the Court to conclude there is at least a genuine dispute of material fact as to whether the policy furthered a compelling government interest.

Where the government restricts conduct but "fails to enact feasible measures to restrict other conduct producing . . . harm of the same sort, the interest given in justification of the restriction is not compelling." *Lukumi Babalu Aye*, 508 U.S. at 546–47. For this reason, the

granting of frequent or arbitrary exceptions to an otherwise blanket rule "undercuts any contention" that the motivating interest is compelling. *Rader v. Johnston*, 924 F. Supp. 1540, 1557 (D. Neb. 1996) (finding stated interests not compelling because defendant university allowed exceptions to more than one-third of the students affected by the rule) (citing *Lukumi Babalu Aye*, 508 U.S. at 546–48; *see also Quaring v. Peterson*, 728 F.2d 1121, 1126–27 (8th Cir. 1984) (rejecting argument that denying an exception to the plaintiff served a compelling state interest where the state allowed numerous exceptions). If, as it appears from the record, prison officials allowed maximum-security inmates to participate in sweat lodge ceremonies despite a supposed security interest in prohibiting such participation, the Court cannot find as a matter of law that the policy furthers a compelling government interest.

For similar reasons, the Court cannot rule as a matter of law that the policy is the least restrictive means of ensuring the required level of prison security. Particularly in light of defendants' recent decision to rescind the categorical prohibition in favor of a case-by-case approach, a much less restrictive policy, there is at least a genuine dispute as to whether defendants lack "other means of achieving [their] desired goal without imposing a substantial burden on the exercise of religion . . . ." *Holt*, 574 U.S. at 353. Defendants' burden is to show the proposed alternative is ineffective, *Yellowbear v. Lampert*, 741 F.3d 48, 63 (10th Cir. 2014); the fact they elected it themselves suggests they would have difficulty doing so.

For the Court to accept defendants' argument that the policy satisfies strict scrutiny would require "a degree of deference that is tantamount to unquestioning acceptance." *Holt*, 574 U.S. at 364 (rejecting prison officials' "argument that denying petitioner a ½–inch beard actually furthers the Department's interest in rooting out contraband"); *see also Lovelace*, 472 F.3d at 190 ("Given the superficial nature of the defendants' explanation, we cannot at this stage conclude that the

asserted interest is compelling as a matter of law."); *Couch v. Jabe*, 679 F.3d 197, 201 (4th Cir. 2012) ("the mere assertion of security or health reasons is not, by itself, enough for the Government to satisfy the compelling governmental interest requirement") (quoting *Washington v. Klem*, 497 F.3d 272, 283 (3d Cir. 2007)); *Nat'l Fed'n of the Blind v. F.T.C.*, 420 F.3d 331, 345 (4th Cir. 2005) ("Even when the government has a compelling interest … it may not seek to further that interest by creating arbitrary distinctions … that bear no 'reasonable fit' to the interest at hand.") (quoting *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 416-17 (1993)).  The defendants' non-enforcement and subsequent recission of a policy they claim is the least restrictive means necessary to ensure prison security is fatal to their motion for summary judgment.

Defendants' motion for summary judgment is denied as to Pevia's RLUIPA claim against the Secretary of DPSCS and the Commissioner of Correction.

## IV.   Conclusion

For the reasons set forth above, defendants' motion, ECF 56, treated as a motion for summary judgment, is granted as to plaintiff's § 1983 claim and denied as to his RLUIPA claim against the Secretary of DPSCS and the Commissioner of Correction.  Plaintiff's RLUIPA claims against defendants Warden Bishop and Assistant Warden Nines are dismissed.  Robert L. Green, Secretary of DPSCS, and Annie D. Harvey, Commissioner of Correction, are substituted for Secretary Moyer and Commissioner Hill.

A separate Order follows.


March 31, 2022                                    _____/S/_____
                                                              Deborah L. Boardman
                                                              United States District Judge